Fred Cope sued United Insurance Company of America ("United"), alleging a bad faith refusal to pay, and a bad faith refusal to investigate, a $160 claim arising under a cancer policy. The jury, by a general verdict, found in favor of Cope and awarded him $1,000,000 in compensatory damages and $3,000,000 in punitive damages. The Circuit Court of Bullock County entered a judgment on the verdict. United appeals. We reverse and remand.
On April 28, 1975, Cope and his wife purchased a cancer policy from Vulcan Insurance Company. United subsequently assumed, and became responsible for, a block of business from Vulcan, including the Copes' cancer policy. Once a month, an agent from United visited the Copes to collect weekly premiums of $1.30 on the policy, which provided a hospital benefit of actual hospital expenses up to a maximum of $100; an anesthetist's actual charge, not to exceed $75; and a surgeon's charge, up to a maximum of $160. The total exposure of United under this policy for the insured's claim was $335.00. The premiums on the Copes' policy were up to date, and the policy was in force, as of October 1989, when Cope was admitted to the hospital for treatment of prostate cancer. Cope was hospitalized for one day, and a surgeon, Dr. Peter Shashy, performed surgery to remove Cope's testicles.
The policy contained the following provisions regarding claims:
 "NOTICE OF CLAIM — Written notice of claims must be given to one of our offices within 30 days after the occurrence or commencement of any treatment or hospitalization covered by this policy or as soon *Page 409 
thereafter as is reasonably possible. Written notice given by you or on your behalf to one of our authorized representatives, with information sufficient to identify you, shall be deemed notice to us.
 "CLAIM FORMS — Upon receipt of a notice of claim, we will furnish you forms for filing proofs of loss. If such forms are not furnished to you within 15 days after we have received notice, you shall be deemed to have complied with the requirements of this policy as to proof of loss upon submitting within the time fixed by this policy for filing proof of loss, written proof covering the occurrence, the character and the extent of the loss for which claim is made.
 "PROOFS OF LOSS — You must furnish written proof of any expense covered by this policy to us within 90 days after the date of each loss. Failure to furnish such proof within the time required shall not invalidate or reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as is reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required."
After Mr. Cope's surgery, the United agent continued to come by and collect the weekly premium. Because Mr. Cope does not read, Mrs. Cope handles insurance matters for him. Mrs. Cope testified that she gave all the bills she received in connection with Mr. Cope's surgery to the United agent. The agent filled out the claim forms for the Copes and forwarded them to the district office. The district office then verified that the policies were in full force and effect and forwarded the claims to the claims office for payment.
The United agent submitted Mr. Cope's hospital bill for $1010 with a claim form to United on October 27, 1989. The maximum hospital benefit of $100 was paid directly to the hospital on November 8, 1989.[1] The anesthesiologist submitted a bill for $418, with a claim form, directly to United on January 11, 1990. United paid the maximum anesthesiology benefit of $75 on January 22, 1990.
This litigation involves the surgeon's benefit. Mrs. Cope testified that she gave the United agent all bills she received, including numerous duplicate bills from the hospital and the anesthesiologist, which continued to be sent to the Copes because the benefits under the policy did not cover the entire amounts charged. There was no direct evidence that the surgeon's bill was sent to United at the same time as the hospital and anesthesiologist bills. The agent did tell Mrs. Cope, after United had paid the maximum hospital and anesthesiologist benefits, that it had not paid all that it was obligated to pay under the policy, presumably referring to the surgeon's benefit. It was United's position at trial that it did not receive a bill from the surgeon until May 22, 1990. It is not clear from the testimony whether Mrs. Cope submitted the surgeon's bill before May 22, 1990. On direct examination, Mrs. Cope testified as follows:
"Q: Did you make Mr. Windham[2] aware of the surgery?
"A: I did.
 "Q: What did Mr. Windham tell you about that in connection with the insurance policy?
 "A: Well, I had got the bill from the doctor and from the hospital.[3]
"Q: Okay.
 "A: Mr. Windham told me to give it to him and he will take them to the office in Montgomery.
 "Q: You say you got bills from the doctor and the hospital?
"A: Right.
 "Q: Did you have a bill there from Dr. Peter Shashy?
"A: I did.
"Q: Did you give that to Mr. Windham?
"A: Yes.
"Q: You're sure about that? *Page 410 
"A: I'm sure.
". . . .
 "Q: You said that you can read some, and that you had these bills. Can you read well enough to know what the hospital bill was and Dr. Shashy's bill?
"A: Well, yes I could. . . ."
On cross-examination, however, Mrs. Cope was not as clear about whether she had given the United agent the surgeon's bill. She testified as follows:
 "Q: Now, this is a bill. . . . This is from Montgomery Anesthesiology, and that is a bill for $418. See that down at the bottom?
"A: Yes, I see that.
"Q: That is a bill you gave to Mr. Windham?
"A: I gave Mr. Windham every bill I got.
". . . .
 "Q: Yes, ma'am. And this shows Dr. Shashy's name on here doesn't it?
"A: It does.
 "Q: Okay. It has got Dr. Shashy's name in here, but this bill indicates 'Anesthesia for repair inguinal hernia, over five year with/orchiectomy, with or without prosthesis implantation.' $266, and that is for the anesthesia, and I could see where it has got Dr. Shashy's name on it, but this is from Anesthesia and I can see that you thought this was Dr. Shashy's bill.
 "A: They were coming from — I understood that they were coming from Dr. Shashy's, his name is on there.
 "Q: Yes, ma'am, but you understood this was Dr. Shashy's bill even though the statement is from Montgomery Anesthesia and the bill is for putting your husband to sleep. You didn't understand that at the time?
"A: No, I didn't."
The United agent's testimony was that he did not send a bill from the surgeon to the company. On direct examination,[4] he testified as follows:
 Q: Yes, sir. I understand that this goes back several years, and I don't expect you to remember the exact dates and times, but when you did realize the surgical benefit had not been paid, did you tell your district manager about that?
"A: Yes.
 "Q: And did you continue to submit claims for Mr. Cope in an effort to get that bill paid?
 "A: No, I never received anything from the surgeon.
 "Q: My question was, did you continue to submit bills for Mr. Cope accompanied by the bills that Mrs. Cope and Mr. Cope were giving you?
"MR. ANDERSON: At what time, Lynn?
"Q: At any time.
 "A: I mean, all during — every little bill she ever gave me I submitted to the company."
Mr. Windham testified further on cross-examination:
 "Q: Okay, so it is clear, you are telling the ladies and gentlemen of the jury that you never got a copy from Mrs. Cope of Dr. Shashy's bill that was sent in?
"A: No, that was mailed directly to the company."
And, in a portion of Mr. Windham's redirect examination and recross-examination, there was a question about the consistency of his testimony at trial in relation to his deposition testimony. The trial testimony was as follows:
"[On redirect examination]
 "Q: The question was asked, 'What was the purpose of you submitting this claim?' Your answer was, 'They received additional statements from either the hospital or the doctor or someone. Each time they received a statement or a bill I would take it and file it the same as the previous one.' And is that consistent with what you told us today; is that correct?
"A: Yes.
 "Q: And later on I asked you this question: 'And the bills they gave you were what?' And your answer was, 'They were *Page 411 
from the hospital, from the surgeon, and from the anesthesiologist for them.' Was that your answer on that occasion?
"A: I don't know.
"Q: Okay. If the deposition —.
"A: What date is on there?
"Q: June 21 — I'm sorry, June 10, 1991.
"A: Yes.
"Q: Would that be correct?
"A: Yes.
". . . .
"[On recross-examination]
 "Q: Mr. Windham, you don't remember ever getting a bill from Dr. Shashy —
"A: No.
"Q: — from the Copes?
"A: No. I got it from the anesthesiologist.
 "Q: Okay. The doctor's bill, I've got six doctor's bill[s] from the anesthesiologist. Is that what you are talking about?
"A: Yes.
"Q: Okay.
"A: I never saw bills from the surgeon.
 "Q: Yes, sir. And that is from whatever — when he asked you that during the deposition I want to make sure that the jury understands it. You never saw the bill from the surgeon?
"A: No."
On May 22, 1990, if not before, after receiving and denying numerous duplicate bills with claims for benefits already paid, United received a surgery bill for $695 directly from Mr. Cope's surgeon, Dr. Shashy, and it denied payment of that bill. United sent a letter to Mr. Cope on June 19, 1990, denying the claim for the surgeon's charge and stating that the reason for the denial was that the claim was a duplicate. The letter had a toll-free telephone number at the top instructing the recipient to call with any questions regarding the letter. The Copes did not call United.
In September 1990, acting on behalf of Mrs. Cope, an attorney addressed a letter to United agent Windham, asking him to "get me copies of the policies and a copy of the file." This letter prompted United to review Cope's file; it found the surgeon's bill and paid Cope, by check, $172.50, the then maximum surgeon's benefit payable under the policy for the procedure performed by the surgeon. Six weeks later Cope filed this action, seeking damages for United's alleged bad faith refusal to pay the surgeon's benefit or, alternatively, damages for failure to timely investigate the claim for surgeon's benefits.
A bad faith action in Alabama can be premised on either of two grounds: "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal." Chavers v. National Sec. Fire Cas. Co.,405 So.2d 1, 7 (Ala. 1981), citing Vincent v. Blue Cross-Blue Shield ofAlabama, 373 So.2d 1054 (Ala. 1979) (Embry, J., dissenting).
The trial court submitted both claims to the jury. Cope contended at trial that, even if the surgeon's bill was not submitted for payment along with the hospital bill and the anesthesiologist's bill, each of those bills carried the name of the surgeon who had performed the procedure and the procedure was clearly identified on both bills as a surgical procedure. These facts, he argues, cast the burden on United to investigate, and he argues that a simple investigation would have led United to discover that there was an outstanding claim against Cope for the services of the surgeon, $160 of which was covered under the policy.
An insurance company has an obligation to pay all valid claims under the policy and to do so without unreasonable delay, and it cannot avoid that obligation by deliberately refusing to determine whether a claim is valid. However, the obligation to pay or to evaluate the validity of the claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims. In this case the terms of the insurance contract required that Cope furnish United "written proof of any expense." The contract further describes the information needed as "written proof covering the occurrence, the character and the extent of *Page 412 the loss for which claim is made." (Emphasis added.)
Cope argued at trial that although at the point where United had the hospital and anesthesia bills United might not have then also had an actual bill for the surgery submitted either by the Copes or by the surgeon, it had at that point sufficient information to discover who had performed the surgery and to solicit his bill. The insurance contract does not impose that duty on United. The contract requires the insured to submit written proof of the extent of the loss. This Court inMordecai v. Blue Cross-Blue Shield of Alabama, Inc.,474 So.2d 95 (Ala. 1985), rejected the claim that an insurer is under a duty to do more than review the documents that the insured submits to it. Id. at 98. Thus, until Cope submitted a claim in the form specified by the terms of the policy, United had no duty to investigate the surgery claim.
United asked for a directed verdict on the plaintiff's theory of liability based upon the alleged failure to investigate the plaintiff's claim. The trial court refused to direct a verdict in favor of United on that theory, stating its understanding of the plaintiff's theory with this observation:
 "On the bad faith failure to investigate the plaintiff's claim — Mr. Cope's claim, the court feels that the failure to investigate would be that they had the name of the doctor, they knew there was surgery, they denied it knowing that, and they can or should have contacted the doctor themselves. Now, that is a bad faith failure to investigate."
When this Court several years ago recognized the tort of bad faith refusal to pay a valid insurance claim, it anticipated that such claims would be rare. That has not been the experience. Almost every action alleging breach of an insurance contract alleges also a bad faith refusal to pay a valid claim. It may be that the practice of refusing to pay valid claims is more common than this Court anticipated. However, no case from this Court places on an insurance company an obligation to either investigate or pay a claim until the insured has complied with all of the terms of the contract with respect to submitting claims for payment. Here, Cope did not comply with the terms of the policy; he did not submit written proof of "expense covered by this policy." Until the insured furnishes proof of loss in the form required by the policy, the insurer is under no obligation to pay or to investigate the claim.Mordecai v. Blue Cross-Blue Shield of Alabama, Inc.,474 So.2d 95 (Ala. 1985).
Under the facts of this case, the bill for Dr. Shashy's services was not submitted to United until May 1990. Until then United was under no duty to investigate whether the surgery benefits provided under the policy were due. Cope argues that the evidence shows that the surgeon's name appeared on the hospital bill or on the anesthesiologist's bill, or on both, and that that fact placed a duty on United to investigate to determine whether there was a valid claim for the surgeon's bill as provided in the policy. United did not have that duty. Until Cope filed a claim for the surgeon's bill, United had no duty to investigate to determine whether a claim for surgery benefits existed. We hold that the trial court erred in submitting to the jury the theory based upon United's alleged duty to investigate the existence of a claim for the surgery benefits provided in the policy.
United breached its contract with Mr. Cope when it denied the surgery benefits once it received a bill from Dr. Shashy. It contends that it denied this claim through a clerical mistake. Cope argues that there was evidence from which the jury could conclude that once United received a claim for those benefits it deliberately and intentionally denied them without a debatable reason to do so. Assuming, without deciding, that there was evidence from which the jury could so find, we nevertheless must reverse and remand the case for a new trial. The trial court, over United's objection, submitted both theories of liability to the jury: bad faith failure to investigate the claim for surgery benefits and bad faith refusal to pay a valid claim for the same benefits. The jury returned a general verdict. We cannot know that the jury's decision did not rest upon the claimed bad faith failure to investigate *Page 413 
whether surgery benefits were due. Because the verdict might have been returned on a claim that was erroneously submitted to the jury, we must reverse the judgment and remand this case for a new trial. American Gen. Life Acc. Ins. Co. v. Lyles,540 So.2d 696, 700 (Ala. 1988); Old Southern Life Ins. Co. v. Spann,472 So.2d 987, 990 (Ala. 1985); National Sec. Fire Cas. Co. v.Vintson, 454 So.2d 942, 946 (Ala. 1984). As we have shown, under the facts of this case the law did not impose on United a duty to investigate the claim based on the surgeon's bill, and the trial court erred in submitting that claim to the jury.
Because we must reverse the trial court's judgment denying United's motion for new trial for the reason stated, we need not address other grounds for reversal argued in United's brief.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, STEAGALL and INGRAM, JJ., concur.
[1] Cope had assigned the miscellaneous hospital benefits to the hospital.
[2] The United agent.
[3] Note that there was a surgeon and an anesthesiologist involved in Mr. Cope's claim.
[4] Mr. Windham, at the time of trial, was no longer an employee of United. Mr. Cope called him with the intention of using him as a hostile witness.