2005 SD 94

**FARM CREDIT SERVICES OF AMER-ICA, f/k/a Farm Credit Services of America, PCA, Plaintiff and Appellee,**

v.

**Daniel R. DOUGAN, a/k/a Daniel Rex Dougan; Beverly Dougan, Defendants and Appellants.**

No. 23102.

Supreme Court of South Dakota.

Argued on Aug. 25, 2004.

Decided Aug. 24, 2005.

Timothy M. Engel of May, Adam, Gerdes and Thompson, Pierre, South Dakota, Attorneys for plaintiff and appellee.

James P. Hurley of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, South Dakota, Attorneys for defendants and appellants.

KONENKAMP, Justice.

[¶ 1.] While a lender was in the process of foreclosing on its mortgage loan, the borrowers managed to obtain a new loan to pay off the debt and the foreclosure was dismissed. But the borrowers persisted in their counterclaim against the lender, seeking damages for breach of the implied covenant of good faith and fair dealing for the lender's conduct in attempting to foreclose. The essential complaint was that the lender only granted a two-month extension on a late installment payment instead of the longer extension the borrowers sought. Because the lender held adequate security, the borrowers believe there was no good faith economic reason for not giving the requested extension. The circuit court granted summary judgment dismissing the counterclaim. On appeal, we conclude that because the lending agreement specifically permitted the lender's actions, there could be no breach of the covenant of good faith and fair dealing, and therefore summary judgment was properly granted.

## Background

[¶ 2.] Defendants Daniel and Beverly Dougan own a ranch in rural Pennington County. Their earnings come primarily from raising wheat, livestock, and registered horses. They inherited the ranch along with considerable debt when Daniel's grandmother passed away. To pay off the debt and to continue operating the ranch, they obtained several loans in the spring of 2001 from Farm Credit Services of America (FCS). In April, they received a revolving line of credit for $100,000 (Note 101) and an installment loan of $25,000 (Note 151). In May, they borrowed $791,000 (Note 201), secured by a mortgage on the real property, and another $60,000 (Note 152), secured by their personal property. In August, they took an installment loan of $15,000 (Note 153).

[¶ 3.] Financial conditions for the ranch deteriorated after the horrific events of September 11, 2001. Along with all the other nationwide economic repercussions, prices for livestock and commodities plunged. And to compound these troubles, western South Dakota fell under a severe drought. When the Dougans were unable to make their first installment payment for the real estate loan (Note 201) on March 1, 2002, they asked for an extension until October 1, 2002. FCS refused to grant the requested extension, but it did agree to extend the due date to May 1, 2002. On April 1, FCS and the Dougans signed a "Loan Agreement Amendment and/or Revision of Promissory Note" providing for the later payment date. All other loan provisions remained in effect. In addition to falling behind on their real estate loan, they were also delinquent on their March 1 payment for Note 151. Therefore, as a part of the amended agreement with FCS, the Dougans paid $11,991 to cover the past-due payment on Note 151 and the interest due on Note 101. Under the amended loan agreement, "failure to pay any amounts or to otherwise comply with the terms and conditions ... may be treated as a default under the original note(s), mortgage(s), [and] other loan documents."

[¶ 4.] When the May 1 due date arrived, the Dougans failed to make any payments on Note 201 and Note 152. In accord with the loan agreements, FCS ad-

vised them of their default status on the real estate note (Note 201). It warned that if the note was not brought current by July 1, 2002, the default interest rate would thereafter apply. Also, in compliance with the Agriculture Credit Act of 1987, FCS mailed a written notice to the Dougans telling them of the opportunity to restructure their loans. They received the letter, but made no request for loan restructuring. Furthermore, in July 2002, the Dougans were mailed a written notice of their right to mediate the FCS loan claim with the South Dakota Department of Agriculture. Again, they did not respond and, thus, waived their right to mediation. *See* SDCL 54–13–10. FCS accelerated Note 201 and declared the entire balance due on October 2, 2002. When the Dougans failed to make a payment on Note 153 on January 1, 2003, FCS exercised the cross-default provision in the personal property notes and declared all notes in default.

[¶5.] FCS commenced a foreclosure action on January 7, 2003. In their answer, the Dougans counterclaimed for breach of the implied covenant of good faith and fair dealing. The case proceeded on course until September, when the Dougans obtained a new loan from another financial institution and paid off all obligations to FCS. FCS released its mortgage and its action for foreclosure was dismissed. All that remained was the counterclaim. As counsel for the Dougans would later explain, the refusal to grant them additional time to make payments on their overdue debts was unreasonable in view of the large amount of security FCS held. After a hearing, the circuit court granted summary judgment for FCS. On appeal, the Dougans argue that there are genuine issues of material fact on whether FCS breached its loan agreement and the implied covenant of good faith and fair dealing. We address the question whether these issues can be determined as a matter of law.

**Analysis and Decision**

[¶6.] From the language of their counterclaim, it appears that the Dougans are not alleging a *tort* claim for breach of the implied covenant of good faith and fair dealing. Their claim sounds in contract. They aver a breach of "the contracts that exist between the parties, in that [FCS] failed to use good faith in its performance of the contracts[.]" In the context of loan transactions, South Dakota does not recognize an independent *tort* for breach of the implied covenant of good faith and fair dealing. *See Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 842 (S.D. 1990); *see also McKie v. Huntley*, 2000 SD 160, ¶10, 620 N.W.2d 599, 602. Contract claims raise questions of interpretation, and therefore, absent any factual disputes, they remain legal questions. *State Farm Mut. Auto. Ins. Co. v. Vostad*, 520 N.W.2d 273, 275 (S.D.1994) (citing *Dirks v. Sioux Valley Empire Elec. Ass'n*, 450 N.W.2d 426, 427–28 (S.D.1990)).

[¶7.] The Dougans contend that the circuit court erred in granting summary judgment because a "claim of a breach of the covenant of good faith is a jury question." We have never held that these contract claims are always jury questions. On the contrary, summary judgment is a preferred method for disposing of any legally inadequate claim. *Horne v. Crozier*, 1997 SD 65, ¶5, 565 N.W.2d 50, 52. The question here, as in any summary judgment appeal, is "whether genuine issues of material fact existed and whether the law was correctly applied." *Bozied v. City of Brookings*, 2001 SD 150, ¶8, 638 N.W.2d 264, 268 (citing *Harms v. Northland Ford Dealers*, 1999 SD 143, ¶8, 602 N.W.2d 58, 61). We will affirm the trial court's decision if we find any legal basis

to support it. *De Smet Ins. Co. of South Dakota v. Gibson*, 1996 SD 102, ¶ 5, 552 N.W.2d 98, 99; SDCL 15–6–56(c).

### Implied Covenant of Good Faith and Fair Dealing

■ [¶ 8.] We begin our analysis with Judge Kean's landmark opinion in *Garrett v. BankWest, Inc.*, 459 N.W.2d 833 (S.D. 1990). There, this Court held for the first time that "[e]very contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Id.* at 841. Definitions of good faith were taken from the UCC and the RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). *Id.* Good faith is defined as " 'honesty in fact in the conduct or transaction concerned.' " *Id.* (quoting SDCL 57A–1–20(19)); RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). *See also Mahan v. Avera St. Lukes*, 2001 SD 9, ¶¶ 30–31, 621 N.W.2d 150, 159–60; *Nelson v. WEB Water Dev. Ass'n, Inc.*, 507 N.W.2d 691, 698 (S.D.1993). "Good faith is derived from the transaction and conduct of the parties. Its meaning varies with the context and emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Garrett*, 459 N.W.2d at 841 (citing RESTATEMENT (SECOND) OF CONTRACTS § 205, cmt. a (1981)).

■■ [¶ 9.] The Dougans argue that FCS breached the implied covenant of good faith and fair dealing when it refused to grant them an extension until October 1, 2002, in order to make the first payment on their real estate note (Note 201). They contend that, had FCS extended the due date as they requested, rather than only granting a sixty-day extension to May 1, 2001, they would have been able to adequately perform their obligations. With-

out more, this cannot constitute a breach of the implied covenant of good faith. When the express provisions of the loan documents required timely installment payments and no provision entitled the borrowers to extensions as a matter of right, there can be no breach of the implied covenant. This was essentially the holding in *Garrett*, 459 N.W.2d at 847. The covenant of good faith does not create an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement. It is not a repository of limitless duties and obligations. *See id.* at 841.

[¶ 10.] Other courts have held likewise. Good faith has " 'nothing to do with the enforcement of terms actually negotiated' and therefore cannot 'block use of terms that actually appear in the contract.' " *Taylor Equip., Inc. v. John Deere Co.*, 98 F.3d 1028, 1032 (8thCir.1996) (quoting *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 705 (7thCir.1992), *cert. denied*, 506 U.S. 1035, 113 S.Ct. 816, 121 L.Ed.2d 688 (1992)). If the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms. *Id.* (citing *Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.*, 825 F.2d 167, 175 n. 13 (8thCir.1987) (applying South Dakota law)).

Although courts often refer to the obligation of good faith that exists in every contractual relation, ... this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent,

principles of good faith ... fill the gap. They do not block use of terms that actually appear in the contract.

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7thCir.1990) (internal citations omitted).

[¶ 11.] The Dougans entered into a separate amended loan contract allowing one extension and requiring timely payments thereafter. By the terms of their agreement, the Dougans were made aware of the potential consequences if the amended agreement was not adhered to. FCS, therefore, could not have been acting in bad faith in pursuing its contractually permitted rights. *See Uptown Heights Assoc. Ltd. P'ship v. Seafirst Corp.,* 320 Or. 638, 891 P.2d 639, 645–46 (1995).

 [¶ 12.] As part of their bad faith claim, the Dougans argue that in September 2002, FCS misapplied their payments. It appears from our review of the record, however, that Dan Dougan agreed that the payments could be so applied. In his deposition, he testified:

Q. Now, the first three words here say [referring to FCS's letter to his attorney], "As we agreed, I applied the proceeds." Did you agree that that's how the proceeds could be applied?

A. Well, I really didn't—yes.

In any event, a clause of the loan documents provides: "Any amounts submitted by [the Dougans] will, at lender's option, be applied first to the payment of default interest, then to protective advances and fees, then to accrued interest, and finally to principal to the extent of the amount submitted." Thus, the substantive language of the loan agreement gave FCS discretion on where to apply payments. " '[T]he obligation of good faith does not vary the substantive terms of the bargain, ... nor does it provide a remedy for an unpleasantly motivated act that is express-ly permitted by contract.' " *Seafirst,* 891 P.2d at 643 (citations omitted). Good faith honors a party's *"justified* expectations." *Garrett,* 459 N.W.2d at 841 (citation omitted) (emphasis added); *Kham & Nate's Shoes,* 908 F.2d at 1357. To hold otherwise, would jeopardize "the institution of contract[.]" *Kham & Nate's Shoes,* 908 F.2d at 1357 (citing *Travelers Ins. Co. v. Budget Rent–A–Car Sys., Inc.,* 901 F.2d 765 (9thCir.1990)). Use of remedies expressly provided for in a contract will not give rise to a claim for breach of good faith. *See Mahan,* 2001 SD 9, ¶ 32, 621 N.W.2d at 160; Alan Schwartz, *Justice and the Law of Contracts: A Case for the Traditional Approach,* 9 Harv J L & Pub Pol'y 107 (1986).

 [¶ 13.] Even if their payments were applied incorrectly, as they believe, the Dougans do not dispute that they were still not able to bring their loan payments current and they would still have been in default. But the Dougans argue that their farming and ranching operations were interfered with under the loan agreement when FCS shut off Note 101's revolving line of credit. This decision, they contend, prevented them from proceeding with their harvest and horse sales. They argue that because FCS's discretion could not be absolute, its conduct prevented them from making adequate payments and was a breach of good faith. Under the terms of the agreement, however, "Lender, at its option, *may* advance sums to Maker(s) as a revolving line of credit ...." (emphasis added). Discretion was vested in the express terms of the contract. The Dougans were delinquent with their payments on other notes. As the Seventh Circuit Court of Appeals observed, "Banks sometimes bind themselves to make loans (commitment letters and letters of credit have this effect) and sometimes reserve the right to terminate further advances. Courts may not convert

one form of contract into the other after the fact, without raising the cost of credit or jeopardizing its availability." *Kham & Nate's Shoes*, 908 F.2d at 1356–57. Here, FCS was acting within the terms of the contract. In entering into the credit agreement with FCS, the Dougans agreed to the possibility that funds may not be advanced at the option of FCS. "Performance of a contract according to its terms cannot be characterized as bad faith." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn.1996).

▇ [¶ 14.] In the Dougans' view, a jury question exists on whether FCS was *reasonable* in declining to extend the loan payment, in failing to extend more credit, and in later foreclosing. The term "reasonableness" is used in the RESTATEMENT to illustrate types of bad faith.

> Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or *reasonableness*.

RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (emphasis added). Thus, the Dougans argue that FCS, acting *without any legitimate commercial need*, unreasonably refused to provide a longer extension date until the wheat was harvested and a horse sale took place. After all, they insist, FCS was never in danger of losing its security: "FCS was foreclosing and liquidating on assets FCS valued at $2,563,983, with equity valued by FCS at $1,588,783, all because [the] Dougans were short $15,000 from having all payments made in a severe drought year." But as the Oregon Supreme Court held, "[t]he loan agreement ... authorizes foreclosure for any default, not merely for a default that jeopardizes

security." *Seafirst*, 891 P.2d at 647. There, the court ruled that the borrower's claim based on the implied covenant of good faith was without merit under contract terms that expressly provided for the lender's remedies. Here, the Dougans' loan agreement with FCS provided:

> If any principal, interest, or advance is past due, regardless of the length of time, or if there is any failure to comply with any covenant, condition, or agreement contained in this Note, in any loan agreement, or in any mortgage, trust deed, security agreement, or other document given to secure payment of this Note, then, at the election of the holder hereof, all principal, all accrued interest thereon, and all advances will become immediately due ....

The loan documents provided no exculpatory clauses forgiving untimely payments in certain circumstances and the record is void of any suggestion that the Dougans requested or bargained for any. Absent an unconscionable provision, the concept of "reasonableness" will not modify contract terms.

▇ [¶ 15.] The Dougans contend that FCS was over secured, taking into account the value of the real and personal property FCS held as security. Again, however, the loan documents provide *no* intimation that an untimely payment would be waived if the collateral exceeded the amount of the indebtedness. Under *Garrett*, we "should not require a [lender] to totally disregard its own interests and compel it to place itself in a worse position when neither the contract nor the requirement of good faith demand such action." 459 N.W.2d at 847; *First Bank of South Dakota v. VonEye*, 425 N.W.2d 630, 637 (S.D.1988). "A bank is not an investor, but rather a lender with the right to define and limit the risks it will accept." *VonEye*, 425 N.W.2d at 637 (citation omitted).

FCS followed the explicit terms of its bargained for promise.

[¶ 16.] We think it also noteworthy that the Dougans declined to avail themselves of their contractual and legal remedies. FCS only commenced foreclosure after notifying the Dougans of their opportunity to mediate or restructure their loan payments. "The doctrine of waiver is applicable where one in possession of any right, whether conferred by law or by contract, and with a full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right." *Hammerquist v. Warburton*, 458 N.W.2d 773, 778 (S.D.1990). In this commercial transaction, " 'it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves.' " *Kham & Nate's Shoes*, 908 F.2d at 1357 (quoting *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2dCir.1933)).

[¶ 17.] When their financial circumstances became difficult, the Dougans may have expected more from their banking relationship, but whatever solutions and remedies both parties were entitled to had already been provided through the explicit terms of the contract. "Any attempt to add an overlay of 'just cause' . . . to the exercise of contractual privileges would reduce commercial certainty and breed costly litigation." *Id.*

[¶ 18.] Lastly, the Dougans make much of the circuit court's comments from the bench. Even while he was dismissing the case, the judge nonetheless remarked that he thought the conduct of FCS was "unreasonable." The Dougans cited this remark in their briefs and in oral argument to illustrate that the court's reasoning was contradictory on the question of bad faith. Because we take an independent review of the record, we are not bound by the circuit judge's factual assessments in granting summary judgment. *Fritzel v. Roy Johnson Constr.*, 1999 SD 59, ¶ 7, 594 N.W.2d 336, 338 (citing *Spenner v. City of Sioux Falls*, 1998 SD 56, ¶ 7, 580 N.W.2d 606, 609 (citation omitted)). From our review of the transcript, we see that the court alluded to no particular event in its comment, thus we are at a loss to know exactly what was meant. Perhaps the judge believed FCS should have been more forbearing even if its contract entitled it to act as it did. If that was the court's meaning, we express no view on it since we conclude as a matter of law that FCS did not breach its loan agreement or the implied covenant of good faith and fair dealing in proceeding in accord with the terms of the loan documents. The Dougans detail other factual issues to support their argument, but these lack sufficient merit for discussion.

[¶ 19.] As the circuit judge aptly phrased it, "the Dougans are asking in their counterclaim for a better bargain than they agreed to." Indeed, the covenant of good faith and fair dealing ensures that contracting parties get the full benefit of their bargain, but no more. We conclude that the trial court properly granted summary judgment for FCS on the counterclaim.

[¶ 20.] Affirmed.

[¶ 21.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.