#28467-a-MES
**2018 S.D. 84**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IVAN ZOCHERT individually and as
Administrator for the Estate of
Lenore Zochert,                                     Plaintiff and Appellant,

           v.

PROTECTIVE LIFE INSURANCE
COMPANY,                                            Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
MOODY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICK T. PARDY
Judge

* * * *

SEAMUS W. CULHANE
NANCY J. TURBAK BERRY of
Turbak Law Office, P.C.
Watertown, South Dakota            Attorneys for plaintiff and
                                   appellant.


MARK W. HAIGH
EDWIN E. EVANS
RYAN W. W. REDD of
Evans, Haigh & Hinton, LLP
Sioux Falls, South Dakota          Attorneys for defendant and
                                   appellee.


* * * *

ARGUED OCTOBER 2, 2018
OPINION FILED **12/12/18**

#28467

SALTER, Justice

[¶1.]     Ivan Zochert filed a complaint against Protective Life Insurance, Co. (Protective), alleging breach of contract and bad faith. He appeals the circuit court's decision to grant Protective's motion for summary judgment. We affirm.

## Background

[¶2.]     Ivan and Lenore Zochert obtained a supplemental cancer insurance policy from Protective. The policy limited coverage to "loss resulting from definitive [c]ancer treatment" with the requirement that "[p]athologic proof thereof must be submitted." The policy included a schedule of benefits which listed the specific types of coverages available to the Zocherts. Benefits were "payable for those expenses incurred by an insured from 10 days preceding the date of positive diagnosis of [c]ancer or from the first day of a period of [h]ospital confinement during which positive diagnosis is made, whichever is more favorable to you." The policy stated that Protective would send "forms for filing proof of loss" following notice of a claim. Protective would then pay benefits due under the policy after receiving proof of the loss established through "a written statement of the nature and extent of [the] loss[.]"

[¶3.]     On July 5, 2012, a needle core biopsy of tissue from a lump in Lenore's left breast revealed the presence of cancer. In a July 11 pathology report, doctors listed the specific diagnosis as invasive ductal carcinoma. On August 14, Lenore underwent a partial mastectomy and layered closure on her left breast. Two days later she was discharged, but returned to the hospital on August 31 due to

-1-

complications from the procedure. She spent three days in the intensive care unit and was ultimately released from the hospital on September 7.

[¶4.]     Ivan requested claim forms from Protective, which treated the request as notice of a claim and responded by mailing him claim forms on August 17, 2012, that included a patient information form, a physician statement form, and a medical release form. Instructions on the patient information form required that "[a] PATHOLOGY REPORT diagnosing cancer MUST accompany your first claim." The instructions also stated that the claimant should "[s]ubmit all bills related to this cancer claim," and that "[a]ll bills should be itemized" and indicate diagnosis, services, actual charges, and provider information.

[¶5.]     Ivan completed the forms and returned them to Protective. The physician statement form filled out by Lenore's doctor indicated the dates of Lenore's diagnosis and hospital stay. Ivan also sent Protective a Professional Hospital Account Summary (PHAS) that contained a billing summary for the August 14 partial left mastectomy and layered closure. The PHAS indicated that Lenore was both admitted and discharged from the hospital on August 14. Ivan did not include a pathology report or any other bills with his first submission.

[¶6.]     Protective did not initially issue any benefits for the Zocherts' claim, indicating in an explanation of benefits that Ivan needed to include a pathology report to verify the cancer diagnosis. After Ivan asked the hospital to send the report, Protective received a pathology report from a biopsy conducted on August 14. Ivan did not provide the original July 11 pathology report until much later. Based on the August 14 pathology report and the PHAS Ivan previously sent,

Protective issued a benefit check on November 13, 2012, for the partial mastectomy and layered closure procedure.

[¶7.] On December 12, 2012, Ivan called Protective to ask how benefits were determined under the policy, but the claims handler noted that he was "elderly and wasn't able to discuss much." Ivan inquired about a previous explanation of benefits that indicated some charges for Lenore's care had been excluded because they "exceed[ed] the amount which can be considered a covered charge." The Protective claims handler called back the next day to explain the claims process. Ivan told the claims handler that he was having difficulty hearing and requested that she send a letter explaining how the initial claim was paid. He also stated that he would send Protective additional bills. The claims handler sent Ivan a follow-up letter explaining how the benefits had been determined under the policy.

[¶8.] On March 13, 2013, Ivan's attorney, Seamus Culhane, contacted Protective, asking how the surgical benefit was calculated and why in-hospital room and board benefits and in-hospital attending physician benefits had not been paid. Protective responded on March 22 and stated that Ivan had not submitted bills for these other benefits. It explained that it issued payment for the surgery according to the procedure codes on the PHAS. On May 6, Culhane sent Protective billing records for Lenore's first hospital stay, pathology lab charges, and pharmacy charges. Protective processed these bills and issued Ivan a benefit check for the services covered by the policy on May 13. Lenore passed away on August 2.

[¶9.] On August 14, Culhane sent a follow-up letter to Protective, asking why he had not heard from a representative since March. Protective responded by

email, attaching its March 22 response and informing Culhane that it processed room and board benefits on May 13, but had not processed attending-physician benefits because it had not received itemized bills from the physician. The delay did not preclude coverage, though, and Protective assured Culhane that "[t]here is no timely filing for a cancer claim, once we receive any/all itemized bills pertaining to cancer treatment, we will process according to policy provisions."

[¶10.]     Culhane responded, asking whether Protective had requested itemized billing from the physician, what actions Protective undertook to determine the Zocherts' applicable coverages, and how Protective determined the amount of reimbursement Ivan was eligible to receive. Protective answered that it was the insured's responsibility to submit itemized bills so that Protective could, in turn, determine what benefits were payable under the policy.

[¶11.]     Culhane then asked Protective to indicate "where in the policy it says that the insured has to submit the bills?" He also remarked that, "[a]ll I can seem to find is that the *insured must file a proof of loss, which I believe the Zocherts have now done.* I thought it was the insurer's job to investigate the claim, not the policy holder." (Emphasis added). Culhane inquired about what other coverage might apply and who determines if that coverage applies. He further asked, "what I am curious about is what formula and code you used to calculate the payments made to the Zocherts[?]"

[¶12.]     Protective's response confirmed the obligation to provide a *notice of claim* and in subsequent emails also identified the need for itemized bills in order to calculate the correct benefits due under the policy. Protective also noted Ivan's

intensive-care rider provided additional coverage. Finally, Protective explained how the surgical-expense benefit was paid in accordance with the 1969 California Relative Value Schedule, as provided in the policy.[1] Communication between Culhane and Protective about the calculation of benefits continued periodically into November 2013.

[¶13.] On July 21, 2014, Culhane sent Protective a letter and enclosed a spreadsheet he created of Lenore's medical expenses generated from Lenore's billings and medical records, as well as a copy of the complaint for the civil action he intended to file against Protective. The spreadsheet listed all of Lenore's medical procedures, costs, benefit limits, benefits paid, and benefits owed. Protective reviewed the spreadsheet and replied by email, indicating it had only received a pathology report for August 14, 2012, and needed an earlier pathology report to process claims for the initial biopsy.[2] Moreover, Protective indicated that it needed itemized bills specifying the diagnosis and procedure codes.

[¶14.] Culhane responded that "[w]e will happily provide you with the itemized billings." On August 4, 2014, Culhane enclosed a copy of the first pathology report and copies of all the itemized bills related to Lenore's cancer

---

1. The 1969 California Relative Value Schedule provides value codes for procedures. Protective used the value provided by the schedule and multiplied that times $50 for surgery benefits and $42 for anesthesia benefits. The policy included an explanation of this calculation and a sample listing of value codes for common surgical procedures. Insureds could request the benefit amount for procedures not listed on the policy.

2. The policy paid benefits up to ten days before the initial diagnosis. The August 14 pathology report would not have covered the July 5 biopsy because it did not fall within the time frame for coverage. Therefore, the July 11 pathology report was required to pay benefits for the earlier biopsy.

treatment. Protective processed these bills and paid the benefits under the policy on August 29. On September 2, Protective issued a final payment for Lenore's home-recovery benefits.

[¶15.] Around the same time, Ivan commenced this action against Protective, alleging breach of contract and tortious breach of the duty of good faith and fair dealing. The parties both moved for summary judgment.

[¶16.] At a November 6, 2017, hearing, the circuit court granted Protective's motion for summary judgment and denied Ivan's motion. The court ruled that the language of the contract was unambiguous, and Protective did not fail "to pay other benefits allegedly owed[.]" Ivan does not challenge these determinations on appeal. The court noted that the "insurer made timely payments once the pathology report was received, and additional payments once itemized bills were received." It found that Ivan's claim for breach of the covenant of good faith and fair dealing failed because "[t]he benefits were clearly articulated . . . Protective Life paid the benefits that the Plaintiff was entitled in accordance with the language of the policy, and had not breached the language of the policy, and had not acted deceitful[ly]." The court also ruled that "[i]n regards to the independent tort for breach of duty of good faith and fair dealing . . . South Dakota [has] not recognized that action . . . if it did, the record does not support such a claim." For those reasons, the court also rejected Ivan's claim for attorney fees.

[¶17.] Ivan now appeals, and based upon the parties' submissions, we have identified the following issues for our consideration:

1.  Whether Ivan's claim that Protective breached the implied contractual duty of good faith and fair dealing is reviewable.

2.  Whether the circuit court erred when it determined that Protective did not breach the implied contractual duty of good faith and fair dealing.

3.  Whether the circuit court erred in ruling that Protective did not commit bad faith in handling Ivan's claims.

## Standard of Review

[¶18.]     "We review a circuit court's entry of summary judgment under the de novo standard of review." *Harvieux v. Progressive N. Ins. Co.*, 2018 S.D. 52, ¶ 9, 915 N.W.2d 697, 700 (quoting *Wyman v. Bruckner*, 2018 S.D. 17, ¶ 9, 908 N.W.2d 170, 174).  When conducting a de novo review, "[w]e give no deference to the circuit court's decision[.]" *Oxton v. Rudland*, 2017 S.D. 35, ¶ 12, 897 N.W.2d 356, 360.

## Analysis

[¶19.]     The legal principles guiding our review of a circuit court's decision to grant a motion for summary judgement are well-settled:

> We must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law.  The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party.  The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists.  Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied.  If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Brandt v. Cty. of Pennington*, 2013 S.D. 22, ¶ 7, 827 N.W.2d 871, 874 (quoting *Jacobson v. Leisinger*, 2008 S.D. 19, ¶ 24, 746 N.W.2d 739, 745).  Moreover, "[u]nsupported conclusions and speculative statements do not raise a genuine issue

of fact." *Dakota Indus., Inc. v. Cabela's.com, Inc.*, 2009 S.D. 39, ¶ 20, 766 N.W.2d 510, 516.

> 1.    *Whether Ivan's claim that Protective breached the implied contractual duty of good faith and fair dealing is reviewable.*

[¶20.]    Protective argues as an initial matter that Ivan's contractual claim for a breach of the implied duty of good faith and fair dealing is not contained in his complaint, which alleges a breach of contract for express policy provisions and tortious breach of the duty of good faith and fair dealing. Therefore, Protective argues that Ivan is raising a new claim on appeal, and it cannot be considered. *See Liebig v. Kirchoff*, 2014 S.D. 53, ¶ 35, 851 N.W.2d 743, 752.

[¶21.]    While there may be some uncertainty in the formulation of Ivan's claims in the complaint and in his initial summary judgment briefing, a broader review of the record indicates that Ivan raised the contractual duty of good faith and fair dealing in the circuit court. In his response to Protective's motion for summary judgment, Ivan argued specifically that Protective breached its contractual duty of good faith and fair dealing. Also, the circuit court perceived that the issue was before it and addressed the merits of the good faith argument, stating that "the Plaintiff's claim on covenant of good faith and fair dealing fails[.]"

> 2.    *Whether the circuit court erred when it determined that Protective did not breach the implied contractual duty of good faith and fair dealing.*

[¶22.]    "Every contract contains an implied covenant of good faith and fair dealing that prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Schipporeit v. Khan*, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505 (quoting *Farm Credit Servs. of Am. v.*

*Dougan*, 2005 S.D. 94, ¶ 8, 704 N.W.2d 24, 28). Lack of good faith may be evidenced by various conduct, such as "evasion of the spirit of the deal; abuse of power to determine compliance; and, interference with or failure to cooperate in the other party's performance." *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 845 (S.D. 1990). "A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties." *Id.* at 841. The meaning of good faith "varies with the context" of the contract. *Farm Credit Servs.*, 2005 S.D. 94, ¶ 8, 704 N.W.2d at 28. Yet, "'if the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms' under the implied covenant." *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 2007 S.D. 34, ¶ 22, 731 N.W.2d 184, 194 (quoting *Farm Credit Servs.*, 2005 S.D. 94, ¶ 10, 704 N.W.2d at 28).

a. Whether Protective fulfilled its duty to investigate.

[¶23.]     Insurers must make a reasonable investigation of insurance claims before denying benefits. *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 2009 S.D. 69, ¶ 19, 771 N.W.2d 623, 629. The investigation must be based upon the "facts and law available to Insurer at the time it made the decision to deny coverage." *Walz v. Fireman's Fund Ins. Co.*, 1996 S.D. 135, ¶ 8, 556 N.W.2d 68, 70. However, where an insurer's obligation to process claims is governed by the policy's express language, "[t]he covenant of good faith does not create an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement." *Nygaard,* 2007 S.D. 34, ¶ 22, 731 N.W.2d at 194 (quoting *Farm Credit Servs.,* 2005 S.D. 94, ¶ 9, 704 N.W.2d at 28).

[¶24.]        Here, Ivan's effort to invoke the implied duty of good faith by claiming Protective did not discharge what he views as its duty to investigate is at odds with the express claims provisions of the policy.  In clear and unambiguous terms, the policy required an insured seeking benefits to provide Protective with notice of the claim *and* affirmatively prove the nature and extent of the loss.  As to the latter obligation, the policy provided that "you will meet the proof of loss requirements by giving us a written statement of the nature and extent of your loss."  The claim forms Protective sent Ivan were designed for this purpose and were even referenced in the policy, which stated: "we will send you forms for filing proof of loss."  *See* SDCL 58-12-1 (insurers have a duty to furnish forms of proof of loss, but do not "have any responsibility for or with reference to the completion of such proof or the manner of any such completion or attempted completion.").

[¶25.]        Though Ivan correctly observes that the policy did not expressly mandate the submission of itemized billing statements, he overlooks two important considerations.  First, he is plainly not exempt from the requirement to provide proof of his loss, and one way, perhaps the most effective way, to meet this obligation is through the submission of itemized bills.  In addition, however, even if utilizing itemized bills is not the exclusive means for an insured to furnish a "written statement of the nature and extent of [the] loss[,]" Ivan has not suggested a different or superior method of proving his loss.[3]  Indeed, even after sending the

---

3.        A Protective claims official testified at her deposition that the company would have assisted Ivan if he indicated he could not produce bills: "If the insured said: This is all they gave me and they won't give me any more, we would certainly do everything we could to help them file that claim."

spreadsheet summarizing Lenore's bills, Culhane stated he "would be happy" to send the itemized bills.

[¶26.] Distilled to its essence, Ivan's principal argument conflates the separate concepts of notice of a claim or loss and proof of the loss. *See* 13 Steven Plitt et al., *Couch on Insurance* § 186:19 (3rd ed.), Westlaw (June 2018 update) (although notice of loss and proof of loss may be interrelated, "the submission of a proof of loss is a distinct obligation from the insured's duty to provide notice of an occurrence or loss"). Notice of an insured's loss is meant to preserve a claim and prevent an insurer from denying a claim as untimely. *Auto-Owners. Co. v. Hansen Hous., Inc.*, 2000 S.D. 13, ¶ 31, 604 N.W.2d 504, 513. The requirement that an insured furnish proof of loss is different, though, and its purpose is to "allow an insurer to adequately investigate the claim and to estimate its liability." 16 Samuel Williston & Richard A. Lord, *Williston on Contracts* § 49:89 (4th ed.), Westlaw (November 2018 update). Insurers rely "on the insured or other interested parties to supply . . . sufficient and accurate proof of the amount of loss." 13 Steven Plitt et al., *Couch on Insurance* § 186:1 (3rd ed.), Westlaw (June 2018 update).

[¶27.] Here, once Ivan provided both pathology reports and itemized bills as proof of the nature and extent of his loss, Protective properly investigated and processed the claim. It verified Lenore's diagnosis through the pathology reports, checked to see that the services on the bills were covered benefits, and used the medical release form as needed to verify charges on the bills.

[¶28.] At least one other court has reached the same result when confronted with a similar duty to investigate issue. *See United Ins. Co. of Am. v. Cope*, 630 So.

2d 407 (Ala. 1993). In *Cope*, the insured argued that because he sent *some* bills to the insurer, the insurer should have been prompted to investigate and locate remaining bills based on the information already submitted. *Id.* at 411. The Alabama Supreme Court, however, rejected this argument, holding that "the obligation to pay or to evaluate the validity of the claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims." *Id.* The court reasoned, "[u]ntil the insured furnishes proof of loss in the form required by the policy, the insurer is under no obligation to pay or to investigate the claim." *Id.* at 412.

[¶29.] Accepting Ivan's argument that the claims process should be effectively self-executing is unsupportable for reasons that are as practical as they are legal. An insurer in circumstances such as those present here will seldom, if ever, have complete information about when or where an insured is receiving treatment. As one Protective claims official explained during her deposition, "unfortunately, if we don't know . . . what your bills are and what your diagnosis is and when you are going to the doctor, there's no way for us to try and even get that information[.]"

> b. Whether Protective fulfilled its duty to disclose and accurately represent policy provisions.

[¶30.] An insurer violates its duty of good faith by failing to disclose policy benefits it knows it has a duty to provide under the language of the contract. *Biegler v. Am. Family Mut. Ins. Co.,* 2001 S.D. 13, ¶¶ 33-34, 621 N.W.2d 592, 602 (liability insurer engaged in deceit when, among other things, it failed to advise insured of its duty to defend after receiving notice of a third-party's civil action

against its insured). Additionally, an insurer cannot misrepresent what it requires of the insured by forcing the insured to "elect upon which of the clauses in the policy the claim might be made." *Eide v. S. Sur. Co.*, 55 S.D. 405, 226 N.W. 555, 556 (1929).

[¶31.]    Here, Ivan cannot prevail on his claim that Protective breached the implied contractual duty of good faith and fair dealing by failing to inform him of the coverages for which he qualified. Initially, because the contract was unambiguous and set forth a schedule of benefits, Ivan should be charged with knowing applicable coverages, and therefore, what kinds of bills to send. *See Culhane v. W. Nat'l Mut. Ins. Co.*, 2005 S.D. 97, ¶ 16, 704 N.W.2d 287, 292 (rejecting the doctrine of reasonable expectations where policy language is unambiguous). Moreover, there is no indication in the record that Protective misrepresented the benefits to which Ivan was entitled. In fact, in its communication with Ivan and Culhane, Protective explained the reasons for its actions, did not avoid answering inquiries, and provided answers consistent with the policy.

[¶32.]    Also, contrary to Ivan's claims, Protective did not require him to identify policy provisions as a pre-requisite to making his claim. It merely sought compliance with the policy provisions which required a pathology report and a written statement of loss as part of the claims process so it could accurately investigate and process his claim.

c. Whether Protective fulfilled its duty of equal consideration.

[¶33.] We have recognized a *tort* duty of equal consideration in insurance bad faith cases dealing with the third-party claims process. Generally, "'an insurer breaches its duty to give equal consideration to the interests of its insured when making a decision to settle a case' brought against its insured by a third party." *Bertelsen v. Allstate Ins. Co.*, 2011 S.D. 13, ¶ 46, 796 N.W.2d 685, 700 (quoting *Hein v. Acuity,* 2007 S.D. 40, ¶ 9, 731 N.W.2d 231, 235). However, we have not applied this concept outside of the realm of third-party bad faith tort litigation.

[¶34.] Nevertheless, Ivan alleges in his brief that Protective breached the implied contractual duty of good faith and fair dealing by failing to give his "interest in *having the claim paid* equal weight to the company's interest in *not paying the claim.*" (Original emphasis). He cites one occasion in which Protective used the medical authorization form to verify the length of Lenore's hospital stay, asserting this act demonstrates that Protective was motivated by an inclination to limit benefits and find reasons not to pay.[4]

[¶35.] We are not inclined to transfigure the duty of equal consideration into an implied contractual provision in a first-party claims context such as the one presented here. An insurer determining a first-party claim does not act "like . . . a fiduciary" with respect to its insured as it does for a claim by a third-party against its insured. *Bertelsen,* 2011 S.D. 13, ¶ 47, 796 N.W.2d at 700. Indeed, it may well

---

4. Even if we were to review Ivan's equal consideration claim further, this example illustrates vexing incongruity in Ivan's argument—Protective should undertake an investigation to determine the details of Lenore's care, but doing so can be evidence of an intent to avoid paying benefits.

be that an insurer and an insured have distinct and even conflicting interests in some first-party claims. *Harvieux*, 2018 S.D. 52, ¶ 13, 915 N.W.2d at 701 (quoting *Hein*, 2007 S.D. 40, ¶ 10, 731 N.W.2d at 235) (for first-party allegations of bad faith, the insurer and the insured are adversaries, and the insurer may challenge claims that are "fairly debatable" and not "frivolous or unfounded"). Therefore, imposing a duty of equal consideration for first-party claims could fundamentally alter the rights and obligation of insureds and insurers contained in the express contractual provisions of the policy.

[¶36.] Here, the policy provisions governed the claims process, and when Ivan furnished proof of his loss, Protective paid him the benefits to which he was entitled. No arguable duty of equal consideration could be implicated here in any event.

>3. *Whether the circuit court erred in ruling that Protective did not commit bad faith.*

[¶37.] In general terms, "we have consistently refused to recognize an independent tort action" for the breach of the implied covenant of good faith and fair dealing. *Trouten v. Heritage Mut. Ins. Co.*, 2001 S.D. 106, ¶ 30, 632 N.W.2d 856, 862. However, an exception exists in the context of insurance contracts where a violation of the implied contractual provision constitutes the independent tort of bad faith. *Id.* ¶¶ 29-30, 632 N.W.2d at 862–63. In *Trouten*, we also recognized an insured's ability to seek punitive damages for bad faith as an incident of the "special relationship between the insurer and the insured" and discouragement of "objectionable corporate policies[.]" *Id.* ¶ 31, 632 N.W.2d at 863 (quoting *Egan v. Mut. Omaha Ins. Co.*, 620 P.2d 141, 146 (Cal. 1979)).

[¶38.] An insurance bad faith action in the first-party context arises "when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured." *Bertelsen*, 2011 S.D. 13, ¶ 46, 796 N.W.2d at 700 (quoting *Hein,* 2007 S.D. 40, ¶ 10, 731 N.W.2d at 235). "In order to be successful on a claim of bad faith, a plaintiff must prove: '(1) an absence of a reasonable basis for denial of policy benefits, and (2) the insurer's knowledge of the lack of a reasonable basis for denial.'" *Harvieux,* 2018 S.D. 52, ¶ 13, 915 N.W.2d at 701 (quoting *Mordhorst v. Dakota Truck Underwriters & Risk Admin. Servs.*, 2016 S.D. 70, ¶ 9, 886 N.W.2d 322, 324).

[¶39.] The knowledge or reckless disregard of a reasonable basis may be inferred based on "indifference to facts or to proofs submitted by the insured." *Champion v. U.S. Fid. & Guar. Co.*, 399 N.W.2d 320, 324 (S.D. 1987) (quoting *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275 (Colo. 1985)). When the issue is the delay of payments, rather than outright denial, the plaintiff "must demonstrate that there was an absence of a reasonable basis for the delay and defendants' knowledge, or reckless disregard, of the absence of a reasonable basis." *McDowell v. Citicorp U.S.A.*, 2007 S.D. 53, ¶ 16, 734 N.W.2d 14, 19; *see also Julson v. Federated Mut. Ins. Co.*, 1997 S.D. 43, ¶ 8, 562 N.W.2d 117, 120 (when there has not been a denial of benefits, plaintiff must demonstrate that insurer violated "any of the duties imposed by the insurance contract which would constitute a basis for this tort action."). However, "[b]ecause an insurance policy is a contract, the parties are bound to its terms and insurance companies are allowed, subject to statutory

constraints, to limit their liability and impose conditions upon their obligation to pay." *Phen v. Progressive N. Ins. Co.*, 2003 S.D. 133, ¶ 6, 672 N.W.2d 52, 54.

[¶40.] Here, the undisputed material facts fail to support the existence of a separate tort claim against Protective. The circuit court correctly held that the claims provisions of the policy were unambiguous—a conclusion that Ivan does not dispute in this appeal. Therefore, the contract terms which are at the heart of the bad faith analysis apply to the question of whether Protective had a reasonable basis for its conduct.

[¶41.] As indicated, the policy expressly required Ivan to provide proof of loss in the form of "a written statement of the nature and extent of . . . loss[.]" Protective relied upon the unambiguous language in determining whether and when Ivan was entitled to receive benefits under the policy. There are, on this record, no disputed material facts which suggest it acted with the kind of conscious wrongdoing required to sustain a bad faith tort claim.[5] Simply put, waiting for an insured to furnish sufficient proof of loss pursuant to the requirements of the policy is a reasonable basis for not paying benefits.

[¶42.] Ivan's additional claims of further tortious conduct on the part of Protective do not raise disputed issues of material fact because they are

---

5. Although the circuit court overlooked the existence of the bad faith tort in the insurance context, we can affirm the court for any basis which supports the court's ultimate determination. *BAC Home Loans Servicing, LP v. Trancynger*, 2014 S.D. 22, ¶ 8, 847 N.W.2d 137, 140 (quoting *De Smet Farm Mut. Ins. Co. of S.D. v. Busskohl*, 2013 S.D. 52, ¶ 11, 834 N.W.2d 826, 831) ("If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.").

unconnected to the payment of benefits in this case. For example, his allegation that claims handlers searched for ways to avoid paying covered benefits had no causal bearing upon the payment of Ivan's claim. The same is true of a handwritten note from Protective's claim file which incorrectly stated a policy provision.[6] Ivan's claim that Protective "uses employee incentive plans to promote individual adherence to practices that promote the company's profitability" is also not material to the dispute before us since it bears no causal connection to the claims process here. *See Harvieux*, 2018 S.D. 52, ¶ 20, 915 N.W.2d at 703 ("Harvieux presented no evidence that . . . Progressive's internal policies caused it to unreasonably investigate or evaluate her UM claim.").

[¶43.]     Here, Ivan acknowledges he received all the benefits due under the policy. There is no evidence that any of this additional alleged conduct led to Protective processing his claim incorrectly. In fact, the undisputed material facts show that when sufficient proof of Ivan's loss was submitted, Protective consistently and promptly processed the claim and paid all benefits owed.

## Conclusion

[¶44.]     We recognize that the process of gathering paperwork and documentation necessary to comply with the proof of loss requirements of an insurance policy can be challenging, especially when simultaneously dealing with the sickness or death of a loved one. However, the insurer-insured relationship is governed by contract, and the record before us demonstrates that Protective acted

---

6.     The claims handler's note mistakenly failed to recognize the ten-day period prior to a cancer diagnosis during which claims can be made.

within the terms of its policy with Ivan. We affirm the circuit court's order granting Protective's motion for summary judgment because there are no genuine issues of material fact indicating Protective breached its contract with Ivan.

[¶45.]     GILBERTSON, Chief Justice, and KERN and JENSEN, Justices, concur.