#25647-aff in pt, rev in pt & rem-GAS

**2011 S.D. 13**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

BONNIE J. BERTELSEN and
PAUL D. BERTELSEN,
husband and wife,                                    Plaintiffs and Appellants,

v.

ALLSTATE INSURANCE COMPANY,
an Insurance Corporation,                      Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE WILLIAM J. SRSTKA, JR.
Judge

\* \* \* \*

PAUL T. BARNETT
SCOTT G. HOY of
Hoy Trial Lawyers, Prof., LLC
Sioux Falls, South Dakota                        Attorneys for plaintiffs
                                                                   and appellants.


CATHERINE M. SABERS
THOMAS G. FRITZ of
Lynn, Jackson, Shultz & Lebrun, PC
Rapid City, South Dakota                         Attorneys for defendant
                                                                   and appellee.

\* \* \* \*

ARGUED JANUARY 10, 2011

OPINION FILED **04/06/11**

#25647

SEVERSON, Justice

[¶1.]        Paul and Bonnie Bertelsen brought this action against Allstate

Insurance Company for breach of contract and bad faith arising out of Allstate's

failure to pay medical benefits under the Bertelsens' personal automobile insurance

policy.  On cross-motions for summary judgment, the trial court dismissed their

complaint.  The Bertelsens appealed, and this Court reversed and

 remanded for trial.  After a five-day jury trial, the trial court did not submit the

Bertelsens' punitive damages claim to the jury.  The jury ultimately returned a

verdict awarding the Bertelsens $33,000 for breach of contract but rejecting their

bad faith claim.  We affirm in part, reverse in part, and remand with directions for

proceedings consistent with this opinion.

## Background

[¶2.]        The underlying facts of this case are set forth in *Bertelsen v. Allstate

Ins. Co.*, 2009 S.D. 21, 764 N.W.2d 495.  Bonnie worked as an in-home registered

nurse for Universal Pediatric Services (UPS).  On December 26, 2005, Bonnie was

severely injured in an automobile accident while driving a UPS vehicle to a

patient's home to perform her nursing duties.  As a result of the accident, Bonnie

spent six weeks in the hospital recovering from her life-threatening injuries,

underwent numerous surgeries, lost eight months of work, and incurred

$382,849.92 in medical expenses.

[¶3.]        Bonnie subsequently filed a claim for workers' compensation benefits

with AIG, UPS's workers' compensation carrier.  AIG denied the claim on January

10, 2006, and again on February 7, 2006.  AIG asserted that Bonnie's injury did not

arise out of and in the course of her employment with UPS. AIG sent a copy of its denial letter to the South Dakota Department of Labor.

[¶4.] The Bertelsens' personal automobile insurance policy with Allstate provided $100,000 in medical payments coverage:

> Allstate will pay to or on behalf of an insured person all reasonable expenses actually incurred by the insured person for necessary medical treatment, medical services, or medical products actually provided to the insured person by a state licensed health care provider.

The policy contained a workers' compensation exclusion: "This coverage does not apply to any person to the extent that the treatment is covered under any workers' compensation law." And the policy contained a conformity-to-state-statutes provision: "When any policy provision is in conflict with the law of the state in which the insured auto is principally garaged, the minimum requirements of the law of the state apply."

[¶5.] In February 2006, the Bertelsens advised Allstate that AIG denied Bonnie's workers' compensation claim and gave Allstate notice of a potential medical payments claim. The Bertelsens provided Allstate with their AIG claim number and the AIG claims adjuster's name and contact information. Allstate spoke with AIG's claims adjuster and confirmed the denial. Allstate noted the basis for AIG's denial in its claims file:

> [T]he employees are not on the payroll while en route to an assignment. They don't start getting paid until they arrive at the job. Linda therefore denied coverage under work comp. Coverage was denied a week ago. She will fax a copy of the denial.

Allstate requested written proof of loss for Bonnie's medical payments claim. The Bertelsens provided Allstate with Bonnie's medical records and bills far exceeding the policy limits and demanded payment of the $100,000 under the medical payments provision of the policy. Allstate continued to investigate Bonnie's claim through spring 2006. By May 2006, Bonnie's medical expenses were approaching $300,000.

[¶6.] Although Allstate's claims manual requires immediate notice to policyholders of any coverage issue, Allstate wrote to the Bertelsens in June 2006, raising the workers' compensation exclusion in the policy for the first time:

> A review of Bonnie Bertelsen's auto policy shows in circumstances where an insured is driving a non-owned vehicle or in this case a vehicle owned by the company she works for, all available medical payment[s] coverage and worker[s'] compensation coverage must be exhausted before Allstate Medical Coverage applies.

The letter again requested the AIG claims adjuster's name and contact information. It further indicated, "Rest assured, once the investigation is complete and all available coverage is exhausted, Allstate will move quickly to resolve [Bonnie's] claim."

[¶7.] Allstate's medical payments benefits were not forthcoming. By summer 2007, the Bertelsens experienced medical providers' increasing demands for payment. On December 19, 2007, Bonnie filed a petition with the South Dakota Department of Labor, seeking workers' compensation coverage.[1] AIG answered

---

1. An Allstate claims adjuster testified at trial that he contacted Thomas Blake, the Bertelsens' attorney, several days after the Bertelsens received the letter from Allstate raising the workers' compensation exclusion. He contends that

(continued . . .)

Bonnie's petition on January 22, 2008, and for the first time admitted coverage for "all past, present, and future medical, hospital, and health care expenses for her work-related injury." The Bertelsens later settled their claim with AIG for $150,000.

[¶8.] The Bertelsens also settled claims with various other insurers. The Bertelsens sought medical payments benefits from Hartford Insurance Company, UPS's automobile insurer. Hartford paid its $30,000 limits in April 2006. The Bertelsens also settled their underinsured motorist claim with Hartford for $900,000. The Bertelsens settled their claim with State Farm, the negligent tortfeasor's automobile insurance company, for $100,000. Additionally, they sought payment of their medical expenses from Avera Health, Bonnie's health insurer. Avera paid the Bertelsens $157,433.87. The Bertelsens' other health insurers, Sanford Health Plan and Blue Cross of California, paid additional health benefits. In sum, various insurers eventually paid the Bertelsens approximately $1.2 million. After subrogation and the payment of medical bills, the Bertelsens retained approximately $660,000. Although various insurers ultimately paid most of Bonnie's medical expenses, the Bertelsens allege that they suffered approximately $33,000 in contract damages as a result of Allstate's failure to pay medical benefits.

[¶9.] In December 2007, the Bertelsens initiated this breach of contract and bad faith action against Allstate. The Bertelsens alleged that Allstate breached its

_____

(. . . continued)

Blake agreed to pursue the workers' compensation claim at that time. This conversation is not noted in Allstate's claims file, and Blake denies that it took place.

insurance contract by failing to pay medical benefits with knowledge that AIG denied Bonnie's workers' compensation claim. The Bertelsens primarily relied on SDCL 62-1-1.3:

> If an employer denies coverage of a claim on the basis that the injury is not compensable under this title . . . , such injury is presumed to be nonwork related for other insurance purposes, and any other insurer covering bodily injury or disease of the injured employee shall pay according to the policy provisions. . . . If it is later determined that the injury is compensable under this title, the employer shall immediately reimburse the parties not liable for all payments made[.]

Because Allstate did not comply with SDCL 62-1-1.3, the Bertelsens contended that Allstate's failure to pay medical benefits was "frivolous," "unfounded," and constituted bad faith.

[¶10.] The Bertelsens moved for summary judgment on their breach of contract claim, and Allstate moved for summary judgment on both claims. Relying on the workers' compensation exclusion in the policy, the trial court granted Allstate's motion for summary judgment. The trial court held that because AIG ultimately paid Bonnie's workers' compensation claim, Allstate had an "articulable and reasonable basis for the denial of benefits." The trial court further held that "a denial of a claim that is fairly debatable and is found to be not compensable under the policy terms should not constitute bad faith."

[¶11.] The Bertelsens appealed, and we reversed and remanded for trial. On the breach of contract claim, we held that "Allstate breached its contractual and statutory duty to immediately pay medical benefits for bodily injury after Bonnie's workers' compensation claim was denied." *Bertelsen*, 2009 S.D. 21, ¶ 22, 764 N.W.2d at 501. We also addressed the Bertelsens' bad faith claim, holding that

Bonnie's claim was not fairly debatable because "Allstate's obligation was clear from the statutory language alone[.]" *Id.* ¶ 20. Because genuine issues of material fact remained, we remanded for trial to address the issues of contract damages and Allstate's intent in failing to pay medical benefits. *Id.* ¶ 22.

[¶12.] On remand, the Bertelsens again moved for summary judgment on their breach of contract claim. They argued that *Bertelsen* is controlling law and required the trial court to grant judgment as a matter of law on their breach of contract claim. The trial court denied the motion, and the case proceeded to trial on the Bertelsens' breach of contract and bad faith claims. Throughout trial, the trial court blocked the Bertelsens' attempts to present evidence that Allstate breached its contractual and statutory duty to pay and that Bonnie's medical payments claim was not fairly debatable. At the close of the evidence, the Bertelsens moved for directed verdict on their breach of contract claim. Their motion was denied. On Allstate's motion, the trial court did not submit the Bertelsens' punitive damages claim to the jury. The trial court also refused to instruct the jury in accordance with *Bertelsen*. The jury ultimately returned a verdict awarding the Bertelsens $33,000 for breach of contract but rejecting their bad faith claim. The Bertelsens appeal.

## Analysis and Decision

[¶13.] **1. Whether the trial court erred by denying the Bertelsens' motion for summary judgment on their breach of contract claim.**

[¶14.] At issue in *Bertelsen* was the trial court's grant of Allstate's motion for summary judgment on the Bertelsens' breach of contract claim. In addressing that issue, we first noted that SDCL 62-1-1.3 plainly requires insurers covering bodily

injury to pay medical benefits when workers' compensation coverage is denied. *Bertelsen*, 2009 S.D. 21, ¶ 13, 764 N.W.2d at 499. Allstate had a duty under that statute and the policy, which incorporated state coverage requirements, to pay medical benefits immediately when it learned that AIG denied Bonnie's workers' compensation claim. *Id.* ¶ 14. It could "resolve workers' compensation coverage and subrogation issues at a later date." *Id.* We held that, as a matter of law, "Allstate breached its contractual and statutory duty to immediately pay medical benefits for bodily injury after Bonnie's workers' compensation claim was denied." *Id.* ¶ 22. Because genuine issues of material fact existed regarding contract damages, we remanded for trial. *Id.* ¶¶ 18, 22.

[¶15.] On remand, the trial court rejected our analysis of SDCL 62-1-1.3 as mere dicta and denied the Bertelsens' motion for summary judgment on their breach of contract claim. This Court's standard of review of a grant or denial of a motion for summary judgment is well settled. "In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we determine whether the moving party has demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Advanced Recycling Sys., L.L.C. v. Se. Prop., Ltd.*, 2010 S.D. 70, ¶ 10, 787 N.W.2d 778, 783 (quoting *Janis v. Nash Finch, Co.*, 2010 S.D. 27, ¶ 6, 780 N.W.2d 497, 500). In considering a trial court's grant or denial of summary judgment, this Court "will affirm only if all legal questions have been decided correctly." *Id.* (quoting *Gehrts v. Batteen*, 2001 S.D. 10, ¶ 4, 620 N.W.2d 775, 777).

[¶16.]     The trial court's rejection of *Bertelsen* prejudiced the Bertelsens' ability to fully and fairly present their case to the jury. The trial court thwarted the Bertelsens' attempts to introduce evidence at trial that insurers covering bodily injury must pay medical benefits when workers' compensation coverage is denied. Yet the trial court permitted Allstate to present evidence that all involved in this case, including the Bertelsens, believed that Bonnie was acting within the course and scope of her employment when the accident occurred. Despite the plain language of SDCL 62-1-1.3, Allstate argued to the jury that it properly denied Bonnie's claim under the workers' compensation exclusion in the policy. Accordingly, Allstate also argued that it could not be held liable for bad faith because Bonnie's claim was "fairly debatable."

[¶17.]     Indeed, the trial court's rejection of *Bertelsen* pervaded the entire trial. Before opening statements, the Bertelsens' attorney inquired if the jury would decide whether Allstate breached its contractual and statutory duty to pay. The trial court responded:

> I tell you what, as soon as the Supreme Court presides on this case, then the ruling that they made will stand, but as long as I'm presiding and it's my rules, and so far I haven't ruled that anybody has breached anything, okay. So let's get this Supreme Court business behind us. All that decision says is that we're going to have a trial, all right. So that's what we're having right now.

And the trial court repeatedly refused to instruct the jury that Allstate breached its contractual and statutory duty to pay:

> All right. I just want to make one final comment about *Bertelsen v. Allstate*, the Supreme Court opinion, on the record. And that is my opinion that was a summary judgment that was reversed, and anything in there stated about who was who and what was,

that is strictly obiter dictum and not applicable to this – and it doesn't apply to this case and I don't – I don't consider it controlling. I think there's a question of fact as to whether there was a breach, and that's why I've instructed this the way I have.

[¶18.]       The Bertelsens argue that *Bertelsen* is controlling law and required the trial court to grant summary judgment on their breach of contract claim on remand. We have said that "a question of law decided by [this Court] on a former appeal becomes the law of the case in all its subsequent stages and will not ordinarily be considered or reversed on a second appeal when the facts and the questions of law presented are substantially the same." *In re Estate of Siebrasse*, 2006 S.D. 83, ¶ 16, 722 N.W.2d 86, 90 (quoting *Jordan v. O'Brien*, 70 S.D. 393, 396, 18 N.W.2d 30, 31 (1945)). "The 'law of the case' doctrine is intended to afford a measure of finality to litigated issues." *Id.* ¶ 17 (quoting *W. States Land & Cattle Co. v. Lexington Ins. Co.*, 459 N.W.2d 429, 435 (S.D. 1990)).

[¶19.]       Allstate argues that this Court's analysis of SDCL 62-1-1.3 in *Bertelsen* is mere dicta.[2] The relevant portions of *Bertelsen* are controlling law. This Court's analysis of SDCL 62-1-1.3 was the basis for overturning the trial court's grant of summary judgment on the breach of contract claim. The language of that statute is as clear today as it was when we decided *Bertelsen*. It plainly requires insurers covering bodily injury to pay medical benefits immediately when workers' compensation coverage is denied. *Bertelsen*, 2009 S.D. 21, ¶ 13, 764 N.W.2d at 499.

---

2.     "Dicta are pronouncements in an opinion unnecessary for a decision on the merits." *Moeller v. Weber*, 2004 S.D. 110, ¶ 44 n.4, 686 N.W.2d 1, 15 n.4.

[¶20.]     We clarify, however, that the duty to pay under SDCL 62-1-1.3 does not defeat an insurer's duty to investigate a claim. An insurer may request an insured's medical records and bills relating to a claim and may conduct any other necessary investigation. But at the point that workers' compensation coverage is denied, and an insurer has completed its investigation of the claim, it has a duty to pay medical benefits immediately. SDCL 62-1-1.3; *Bertelsen*, 2009 S.D. 21, ¶ 13, 764 N.W.2d at 499.

[¶21.]     We therefore recognize Allstate's need to conduct an appropriate investigation of Bonnie's medical payments claim. But Allstate knew as early as February 2006 that AIG denied Bonnie's workers' compensation claim. And it is undisputed that by spring 2006, Allstate had completed its investigation of Bonnie's claim. It had, in hand, Bonnie's medical records and bills far exceeding the policy limits. At that point, Allstate had a duty under SDCL 62-1-1.3 and the policy, which incorporated state coverage requirements, to pay medical benefits immediately for Bonnie's bodily injuries. *Id.* ¶ 14. When Allstate persisted in its failure to pay, it breached its contractual and statutory duty to pay immediately as a matter of law. *Id.* ¶¶ 17, 22. On remand, the trial court should instruct the jury accordingly.

[¶22.]     Although we conclude that Allstate breached its contractual and statutory duty to pay, the issue of contract damages remains. *See Bowes Constr. v. S.D. Dep't of Transp.*, 2010 S.D. 99, ¶ 21, 793 N.W.2d 36, 43 (citations omitted) ("[T]he elements of a breach of contract are (1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages."). The Bertelsens argue that because

Allstate unreasonably delayed the payment of medical benefits, it is estopped from asserting its subrogation rights. They thus conclude that they are entitled to a contract damages award of $100,000, the full amount of the medical payments benefits due under the policy, as a matter of law.

[¶23.] We agree that an insurer should not escape liability for breach of contract when it has acted in bad faith or unreasonably delayed the payment of benefits. An insurer may thus waive the right to subrogation or be estopped from asserting it when it has unreasonably delayed the payment of benefits. *W. Am. Ins. Co. v. Cates*, 865 N.E.2d 1016, 1022 (Ind. Ct. App. 2007) (internal citations omitted). *See Sexton v. Cont'l Cas. Co.*, 1991 OK 84, 816 P.2d 1135, 1137 ("An act of an insurer may cause it to waive its subrogation rights or estop the insurer from asserting those rights."). *See also Hart v. State Farm Mut. Auto. Ins. Co.*, 248 N.W.2d 881 (S.D. 1976).

[¶24.] The issue of contract damages is thus related to the Bertelsens' bad faith claim. In *Bertelsen*, we remanded for trial because genuine issues of material fact remained regarding Allstate's intent in failing to pay medical benefits. 2009 S.D. 21, ¶ 21, 764 N.W.2d at 501. Because the trial court thwarted the Bertelsens' ability to fully and fairly present their case on remand, those questions of fact remain today. Allstate's intent in failing to pay medical benefits is an important factor in deciding whether Allstate is estopped from asserting its subrogation rights. With that factual dispute unresolved, we cannot decide whether the Bertelsens are entitled to a contract damages award of $100,000 as a matter of law. We thus remand for trial on the issue of contract damages. If the Bertelsens establish that

Allstate is estopped from asserting its subrogation rights, they may be entitled to a contract damages award of $100,000, the full amount of medical payments benefits due under the policy, as a matter of law.

[¶25.]     **2.     Whether the trial court abused its discretion by improperly instructing the jury.**

[¶26.]     The Bertelsens argue that the trial court abused its discretion by improperly instructing the jury.  We have previously clarified our standard of review for jury instructions:

> A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard.  However, no court has discretion to give incorrect, misleading, conflicting, or confusing instructions; to do so constitutes reversible error if it is shown not only that the instructions were erroneous, but also that they were prejudicial.

*Wangsness v. Builders Cashway, Inc.*, 2010 S.D. 14, ¶ 10, 779 N.W.2d 136, 140 (quoting *State v. Cottier*, 2008 S.D. 79, ¶ 7, 755 N.W.2d 120, 125).  "Erroneous instructions are prejudicial when in all probability they produced some effect upon the verdict and were harmful to the substantial rights of a party."  *Id.* (citing SDCL 15-6-61).

*Statement of the Case and Preliminary Instruction*

[¶27.]     The Bertelsens first argue that the wording of the trial court's statement of the case in its preliminary instructions was an abuse of discretion. The settlement of that instruction included the following exchange:

> COURT:          It is 8:42.  We're in courtroom 5B.  Counsel is present.  This is the time to settle preliminary instructions.  Any objections on behalf of the plaintiff?

- 12 -

PLAINTIFF: The plaintiffs do not have any objections to the preliminary instructions 1 through 20. We do have a preliminary instruction to submit to the court, which I did on Friday afternoon.

COURT: I saw that.

PLAINTIFF: That was Preliminary Instruction Number 1 I think.

COURT: Any objections on behalf of the defendant?

DEFENDANT: None, Your Honor.

COURT: Preliminary instructions are settled.

DEFENDANT: Your Honor, we did have a preliminary instruction on claims of the parties that we had submitted to you as well.

COURT: Yeah. You don't seem like – it's on the statement of the case, right?

DEFENDANT: Right.

COURT: You don't seem like you agree.

DEFENDANT: That seemed to be fair.

COURT: So I'll just make my own preliminary instruction.

DEFENDANT: Okay.

COURT: So I'll have to pull it up and look at it.

PLAINTIFF: Well, Your Honor, is the court going to provide some type of –

COURT: Yeah, I'm going to tell the jury, yeah, this is the case and blah, blah, blah and blah and blah, blah, blah and blah.

PLAINTIFF: When are we going to get to see that?

| COURT: | I haven't figured out what I'm going to say though. |
| PLAINTIFF: | We'll see that before it gets read to the jury? |
| COURT: | It's not going to be read to the jury. If you want something read to the jury, you agree to it. If you don't want something read to the jury, that's too bad. |

[¶28.] Immediately before reading the settled preliminary instructions, the trial court advised the jury:

> This case involved the plaintiff. The lady who's the plaintiff was involved in a car accident, and she had a contract of insurance with the defendant, Allstate Insurance Company, and she claims that Allstate did not pay certain benefits that they contracted to do, and so therefore she is suing for a breach of contract with Allstate Insurance Company. And she's also stating that Allstate's actions were vexatious and therefore she has been damaged. Also, her husband is alleging certain damages. That's what the lawsuit is about. The law is about suing for damages.

It is unclear whether the trial court intended this statement to be an overview for the jury, a part of the preliminary instructions, or a statement of the case.

[¶29.] If merely an overview for the jury, the statement was error. In it, the trial court not only distorted the issues in the trial by ignoring this Court's ruling in *Bertelsen*, but it also incorrectly stated that the Bertelsens were alleging that Allstate's actions were "vexatious," which is not an element of a bad faith claim. *See Champion v. U.S. Fid. & Guar. Co.*, 399 N.W.2d 320, 324 (S.D. 1987). "[A] finding that an insurer lacked good faith does not signify [that] its conduct was 'vexatious or without reasonable cause' as a matter of law." *Crabb v. Nat'l Indem. Co.*, 87 S.D. 222, 233, 205 N.W.2d 633, 639 (1973). Because the statement was the jury's first exposure to the issues presented in this case, it was not inconsequential. Although

- 14 -

the statement alone may not be sufficient to constitute reversible error, it must be considered in the totality of the events at trial.

[¶30.]     We next consider whether the remarks would have been appropriate as a part of the preliminary instructions. Counsel must be given an opportunity to examine written instructions, including preliminary instructions, and to present and argue objections to them before they are presented to the jury. *Riggs v. Syrovatka*, 75 S.D. 338, 339, 64 N.W.2d 297, 298 (1954). SDCL 15-6-51(b) sets forth the procedure for settling jury instructions:

> The court:
> (1)     Must inform the parties of its proposed instructions and proposed action on the requests before instructing the jury and before final jury arguments;
> (2)     Must give the parties an opportunity to object on the record and out of the jury's hearing to the proposed instructions and actions on requests before the instructions and arguments are delivered; and
> (3)     May instruct the jury at any time after trial begins and before the jury is discharged.

This procedure "may not be waived, and failure to comply with [it] is reversible error." *Riggs*, 75 S.D. at 340, 64 N.W.2d at 298 (citing *Heyl v. Waggoner*, 58 S.D. 420, 236 N.W.2d 375 (1931); *State v. Good*, 58 S.D. 444, 237 N.W. 565 (1931)).

[¶31.]     Finally, we review whether the trial court's statement would have been appropriate as a statement of the case. "A statement of the case is neither a general nor a preliminary instruction." *Kappenman v. Stroh*, 2005 S.D. 96, ¶ 22, 704 N.W.2d 36, 42. The submission of a statement of the case to the jury is governed by SDCL 15-14-1:

> In civil jury cases, prior to the jury having been selected and sworn, the court may read a written statement of the case agreed upon by the parties to the prospective jurors. The

> statement may include a summary of the uncontested facts of the case, the claims of the parties and the issues presented. Any such statement of the case shall be submitted to the parties and agreed to by them before being read to the jury panel. . . .

Here, the trial court could have foregone giving a statement of the case because the parties did not agree to one. But if the trial court's remarks are viewed as a statement of the case, it failed to follow the procedure set forth in SDCL 15-14-1, which requires that the statement be written and submitted to and agreed upon by the parties before being read to the jury.

*Breach of Contract Instructions*

[¶32.]    The Bertelsens challenge each of the trial court's instructions regarding their breach of contract claim. They argue that submitting the issue of breach of contract to the jury was an abuse of discretion in light of *Bertelsen*. We agree. And because a clear breach of contract is strong evidence of bad faith, the trial court's failure to properly instruct the jury on the Bertelsens' breach of contract claim prejudiced their substantial rights. *See* SDCL 15-6-61. On remand, the trial court should instruct the jury that Allstate breached its contractual and statutory duty to pay and that the only issue for its determination on the breach of contract claim is the amount of damages proximately caused by that breach.

*Bad Faith Instructions*

[¶33.]    The Bertelsens also challenge several of the trial court's instructions regarding their bad faith claim. They first challenge Final Instruction No. 31:

> Every contract of insurance in South Dakota includes a duty that both parties act and deal in good faith with one another. This duty means that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement.

The Bertelsens argue that this instruction should have included one final sentence: "The breach of that duty is called bad faith." While the wording of Final Instruction No. 31 may not have been ideal, it was not an abuse of discretion. *See State v. Brim*, 2010 S.D. 74, ¶ 15, 789 N.W.2d 80, 86.

[¶34.] The Bertelsens challenge two other instructions regarding their bad faith claim. The first is Final Instruction No. 33:

> Bad faith may be established by proving that:
> (a)    defendant did not have a reasonable basis for denying or withholding policy benefits or for failing to comply with the insurance contract; and
> (b)    defendant knew it did not have a reasonable basis for denying or withholding policy benefits, or acted with reckless disregard in determining whether it had a reasonable basis.
> (c)    plaintiff suffered damages by defendant's acts.
>
> You may conclude that defendant did not have a reasonable basis for its acts or inaction if you find that the defendant recklessly disregarded available facts or law or failed to make a reasonable investigation of the claim.
>
> The law provides that defendant may challenge claims that are fairly debatable and can be held liable only where it knowingly and recklessly denied or failed to pay a claim without a reasonable basis.

The Bertelsens finally challenge Final Instruction No. 35: "Conduct is reckless when a person consciously disregards a substantial risk. A person cannot be reckless if they are unaware of the risk their behavior creates."

[¶35.] The Bertelsens argue that these instructions were error in light of *Bertelsen*. In that case, Allstate argued that Bonnie's medical payments claim was fairly debatable because the application of SDCL 62-1-1.3 to an automobile insurer was a case of first impression. Yet we said that "the language of SDCL 62-1-1.3 is

plain, unambiguous, and not susceptible to debate." *Bertelsen*, 2009 S.D. 21, ¶ 20, 764 N.W.2d at 501. "Allstate's obligation was clear from the statutory language alone, and an interpretative decision from this Court was not necessary for Allstate to have determined its duty under [the] policy." *Id.* Because a disputed issue of material fact remained regarding Allstate's intent in failing to pay medical benefits, we remanded for trial on the Bertelsens' bad faith claim. *Id.* ¶ 21.

[¶36.]    We agree that the trial court's instructions on the Bertelsens' bad faith claim were an abuse of discretion. The trial court should have instructed the jury that Bonnie's medical payments claim was not fairly debatable and that the only issue for its determination on the bad faith claim was Allstate's intent in failing to pay benefits. *See id.* ¶¶ 20-21. Because the denial of a claim that is not fairly debatable is strong evidence of bad faith, the trial court's failure to properly instruct the jury prejudiced the Bertelsens' substantial rights. *See* SDCL 15-6-61. On remand, the trial court should instruct the jury in a manner consistent with our analysis of the Bertelsens' bad faith claim.

[¶37.]    **3.    Whether the trial court erred by not submitting the Bertelsens' punitive damages claim to the jury.**

[¶38.]    The Bertelsens argue that the trial court erred by not submitting their punitive damages claim to the jury. SDCL 21-1-4.1 establishes a threshold to ensure that there is a reasonable basis for punitive damages claims:

> In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the Court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton, or malicious conduct on the part of the party claimed against.

"The trial court's determination that there was a reasonable basis to submit the issue of punitive damages to the jury will not be disturbed absent a showing that the trial court's findings of fact are clearly erroneous." *Harter v. Plains Ins. Co.*, 1998 S.D. 59, ¶ 36, 579 N.W.2d 625, 634 (citing *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 761 (S.D. 1994)).

[¶39.]    Malice is an essential element of a punitive damages claim:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful or wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

SDCL 21-3-2.

[¶40.]    The required malice may be actual or presumed. *Biegler v. Am. Family Ins. Co.*, 2001 S.D. 13, ¶ 45, 621 N.W.2d 592, 605 (citing *Kjerstad v. Ravellette Publ'n, Inc.*, 517 N.W.2d 419, 425 (S.D. 1994)). "Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill-will towards that person." *Id.* (quoting *Case v. Murdock*, 488 N.W.2d 885, 891 (S.D. 1992)). By contrast, presumed malice is "malice which the law infers from or imputes to certain acts." *Harter*, 1998 S.D. 59, ¶ 36, 579 N.W.2d at 634 (quoting *Holmes v. Wegman Oil Co.*, 492 N.W.2d 107, 112-13 (S.D. 1992)). Presumed malice may not "be motivated by hatred or ill-will but is present when a person acts willfully or wantonly to the injury of others." *Biegler*, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605 (quoting *Case*, 488 N.W.2d at 891).

[¶41.]    An insurer's clear breach of contract or denial of a claim that is not fairly debatable may indicate malice. Yet the trial court repeatedly blocked the Bertelsens' attempts to present evidence that Allstate breached its contractual and statutory duty to pay and that Bonnie's medical payments claim was not fairly debatable. By doing so, the trial court thwarted the Bertelsens' efforts to establish a reasonable basis for their punitive damages claim. On remand, the trial court should allow the Bertelsens to develop a record on their punitive damages claim. If the Bertelsens present evidence establishing a reasonable basis for their claim, it should be submitted to the jury.

[¶42.]    **4.    Whether the trial court abused its discretion by concluding that the attorney-client and work-product privileges protect coverage opinions outside counsel prepared for Allstate during the investigation of Bonnie's medical payments claim.**

[¶43.]    In early 2008, the Bertelsens requested production of Allstate's complete claims file. Allstate provided its claims file but redacted some portions of it, asserting the attorney-client and work-product privileges. The Bertelsens filed a motion to compel. The trial court conducted an in camera review of the documents and issued an order granting the Bertelsens access to some, but not all, the information they requested. In late 2009, the Bertelsens learned that Allstate had not produced its complete claims file and filed another motion to compel. The trial court again conducted an in camera review of the documents. It concluded that the coverage opinions outside counsel prepared for Allstate during the investigation of Bonnie's medical payments claim were confidential communications protected by the attorney-client privilege. The trial court thus found it appropriate to redact the

portions of the claims file containing the coverage opinions as well as correspondence notes between Allstate and its outside counsel.

[¶44.]       SDCL 15-6-26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]"  Confidential communications between an attorney and his client are not subject to discovery:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:
> (1)    Between himself or his representative and his lawyer or his lawyer's representative;
> (2)    Between his lawyer and the lawyer's representative;
> (3)    By him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein;
> (4)    Between representatives of the client or between the client and a representative of the client; or
> (5)    Among lawyers and their representatives representing the same client.

SDCL 19-13-3.  Statutory privileges "are to be strictly construed to avoid suppressing otherwise competent evidence."  *Dakota, Minn. & E. R.R. Corp. v. Acuity* (*DM&E*), 2009 S.D. 69, ¶ 57, 771 N.W.2d 623, 639 (quoting *State v. Catch the Bear*, 352 N.W.2d 640, 646-47 (S.D. 1984)).

[¶45.]       The Bertelsens argue that the coverage opinions Allstate obtained from outside counsel while investigating Bonnie's medical payments claim are not confidential communications protected by the attorney-client privilege.  They contend that Allstate had a fiduciary duty to investigate and evaluate Bonnie's claim and that an attorney hired to assist in that investigation was necessarily

consulted on a matter of common interest. Because they are joint clients of the counsel Allstate retained, the Bertelsens conclude that Allstate may not invoke the privilege to prevent them from obtaining the coverage opinions.

[¶46.] In addressing the Bertelsens' argument, we begin by recognizing that insurance bad faith actions are classified as either first-party or third-party claims. *Hein v. Acuity*, 2007 S.D. 40, ¶ 9, 731 N.W.2d 231, 235. A first-party coverage situation arises when an insurance company contracts to pay benefits directly to an insured. *Id.* ¶ 10. First-party bad faith occurs "when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured." *Id.* (citing *Champion*, 399 N.W.2d at 324) (additional citation omitted). By contrast, a third-party coverage situation arises when an insurance company contracts to indemnify an insured against liability to third parties. *Id.* ¶ 9. And third-party bad faith occurs "when an insurer breaches its duty to give equal consideration to the interests of its insured when making a decision to settle a case" brought against its insured by a third party. *Id.* (citing *Kunkel v. United Sec. Ins. Co. of New Jersey*, 84 S.D. 116, 121, 168 N.W.2d 723, 726 (1969); *Crabb*, 87 S.D. at 229-30, 205 N.W.2d at 637).

[¶47.] The contours of the attorney-client privilege vary depending on the nature of the bad faith claim. In a third-party coverage situation, the relationship of an insurer to its insured is like that of a fiduciary because the insurer must give as much consideration to its insured's interests as it does its own. *Trouten v. Heritage Mut. Ins. Co.*, 2001 S.D. 106, ¶ 32, 632 N.W.2d 856, 864 (citing *Long v. McAllister*, 319 N.W.2d 256, 262 (Iowa 1982)). In a subsequent third-party bad

faith suit, the insurer may not invoke the privilege to prevent its insured from obtaining communications with the attorney it hired to represent their joint interests. *See* SDCL 19-13-5(5) (Rule 502(d)).[3] But an insurer and insured are adversaries in a first-party coverage situation. *Hein*, 2007 S.D. 40, ¶ 10, 731 N.W.2d at 235. Because the interests of the insurer and insured conflict, the insurer may retain outside counsel. *Hartford Fin. Servs. Group, Inc. v. Lake Cnty. Park & Rec. Bd.*, 717 N.E.2d 1232, 1235-36 (Ind. Ct. App. 1999). The insurer's retention of counsel is a "classic example of a client seeking legal advice from an attorney." *Id.* at 1236 (quoting *Aetna Cas. & Sur. Co. v. San Francisco Superior Court*, 153 Cal. App. 3d 467, 476, 200 Cal. Rptr. 471, 476 (1984)). The attorney-client privilege thus protects the insurer's communications with counsel in the same manner as any other client seeking legal advice from an attorney.

[¶48.]     And so it is here. Under the medical payments provision in the policy, Allstate contracted to pay medical benefits directly to the Bertelsens, creating an adversarial first-party coverage situation. *See Hein*, 2007 S.D. 40, ¶ 10, 731 N.W.2d at 235. When the Bertelsens notified Allstate of Bonnie's claim, Allstate retained outside counsel to obtain a professional legal opinion on what it considered a novel question of coverage. Allstate's retention of counsel was for the "purpose of facilitating the rendition of professional legal services," which is a "classic example

---

3.     SDCL 19-13-5(5) (Rule 502(d)) provides that "[t]here is no privilege under . . . 19-13-3 . . . [a]s to a communication relevant to a matter of common interest between or among two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients."

of a client seeking legal advice from an attorney."[4]  *See* SDCL 19-13-3; *Hartford*, 717 N.E.2d at 1236.  The Bertelsens were not joint clients of the counsel Allstate retained.  It thus appears that the attorney-client privilege protects the coverage opinions outside counsel prepared for Allstate during the investigation of Bonnie's claim.[5]  *See Hartford*, 717 N.E.2d at 1235-36.

[¶49.]    The Bertelsens nonetheless argue that the coverage opinions fall within the advice-of-counsel exception to the attorney-client privilege.  We have recognized that "a party cannot affirmatively assert reliance upon an attorney's advice and then refuse to disclose such advice."  *Kaarup v. St. Paul Fire & Marine Ins. Co.*, 436 N.W.2d 17, 22 (S.D. 1989) (citing *Duplan Corp. v. Moulinage et Retorderie de Chavnoz*, 509 F.2d 730, 735 (4th Cir. 1974); 8 Wigmore, *Evidence*, §

---

4.    We recently recognized the legal capacity exception to the attorney-client privilege in insurance bad faith cases.  In *DM&E*, we held that "where an insurer unequivocally delegates its initial claims function and relies *exclusively* upon outside counsel to conduct the investigation and determination of coverage, the attorney-client privilege does not protect such communications."  2009 S.D. 69, ¶ 56, 771 N.W.2d at 638.  *See First Aviation Servs., Inc. v. Gulf Ins. Co.*, 205 F.R.D. 65, 69 (D. Conn. 2001); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 137-38 (N.D. Ill. 1993); *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986).  When attorneys act as claims adjusters, their communications to clients and impressions about the facts are treated as the ordinary business of claims investigation, which is outside the scope of the attorney-client privilege.  *DM&E*, 2009 S.D. 69, ¶ 55, 771 N.W.2d at 638.  Here, the evidence has, as yet, not shown that outside counsel acted as a claim adjuster rather than as a legal advisor.  Thus, on the record before us, the coverage opinions Allstate obtained while investigating Bonnie's medical payments claim do not appear to fall within the legal capacity exception to the attorney-client privilege.

5.    Because it appears that the coverage opinions outside counsel prepared for Allstate during the investigation of Bonnie's medical payments claim are protected by the attorney-client privilege, we do not address whether they are also protected by the work-product privilege.

2327 (McNaughten ed. 1961)). Allstate argues that it did not raise an advice-of-counsel defense as it did not argue at trial that its actions were in good faith because it followed the advice of its counsel.

[¶50.] An insurer need not expressly rely upon the advice of counsel to waive the attorney-client privilege. *Allstate Ins. Co. v. Clancy*, 936 N.E.2d 272, 276 (Ind. Ct. App. 2010). Indeed, "[m]ost sophisticated litigants will know better than to dig that hole for themselves." *State Farm Mut. Ins. Co. v. Lee*, 199 Ariz. 52, 64, 13 P.3d 1169, 1181 (2000) (en banc). While express waivers of the privilege are easy to identify, courts widely dispute at what point a client impliedly waives the privilege by injecting privileged communications into a case.[6] In *Hearn v. Rhay*, a federal district court set forth three criteria to determine whether a party impliedly waived the privilege:

---

6. Three general approaches have emerged to determine whether a client has waived the attorney-client privilege by asserting an advice-of-counsel defense. Steven Plitt, *The Elastic Contours of Attorney-Client Privilege and Waiver in the Context of Insurance Company Bad Faith: There's a Chill in the Air*, 34 Seton Hall L. Rev. 513, 534 (2004). The first approach provides that a litigant waives the attorney-client privilege if, and only if, he directly puts his attorney's advice at issue in the case. *Id.* at 535. *See, e.g., Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 863-64 (3d Cir. 1994); *Palmer by Diacon v. Farmers Ins. Exch.*, 261 Mont. 91, 861 P.2d 895 (1993); *Aetna Cas. & Sur. Co.*, 153 Cal. App. 3d at 474, 200 Cal. Rptr. at 475. The second approach provides that a litigant automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises an issue to which privileged material is relevant. *Plitt, supra*, at 534. *See, e.g., In re Bergeson*, 112 F.R.D. 692 (D. Mont. 1986); *Silva v. Fire Ins. Exch.*, 112 F.R.D. 699 (D. Mont. 1986); *Boone v. Vanliner Ins. Co.*, 91 Ohio St. 3d 209, 744 N.E.2d 154 (2001). Finally, the third approach balances the need for discovery with the importance of maintaining the attorney-client privilege. *Plitt, supra*, at 534-35. *See, e.g., Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975); *Lee*, 199 Ariz. at 60, 13 P.3d at 1177; *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254 (Del. 1995).

(1) assertion of the privilege was a result of some affirmative act, such as filing suit [or raising an affirmative defense], by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and, (3) application of the privilege would have denied the opposing party access to information vital to his defense.

68 F.R.D. 574, 581 (E.D. Wash. 1975). *See Lee*, 199 Ariz. at 56, 13 P.3d at 1173.

"[W]here these three conditions exist, a court should find that the party asserting [the] privilege has impliedly waived it through his own affirmative conduct." *Hearn*, 68 F.R.D. at 581. Because it balances the need for discovery with the importance of maintaining the privilege, a majority of jurisdictions have since adopted this test.[7] Plitt, *supra*, at 538.

[¶51.]     Any standard for determining whether a client has impliedly waived the attorney-client privilege must produce predictable results. After all, the privilege serves the interests of justice by encouraging full and frank communication between an attorney and his client. *Upjohn v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981). To achieve that end, the privilege must be predictable. *Rhone-Poulenc Rorer*, 32 F.3d at 863. A privilege that depends on widely varying applications by courts is not predictable and thus

---

7.     We have said that "[w]e are not particularly impressed with characterizations of a doctrine as the 'majority' or 'minority.' We will give due consideration to all decisions of other jurisdictions but will be persuaded only by the soundness of their reasoning and their consistency with our State's law." *Am. Fam. Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 2008 S.D. 106, ¶ 33, 757 N.W.2d 584, 594 (quoting *Koch v. Spann*, 193 Or. App. 608, 616 n.2, 92 P.3d 146, 150 n.2 (2004)).

little better than no privilege at all. *Id.* (quoting *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987)).

[¶52.]     Application of the *Hearn* test alone provides insufficient guidance to be just and workable. In *Lee*, for example, an insurer argued that it acted in subjective good faith based on its evaluation of state law. While the insurer did not expressly raise an advice-of-counsel defense, the claims adjusters' knowledge of the law consisted entirely of the advice of counsel. Because the insurer's evaluation of state law necessarily included the advice of counsel, the Arizona Supreme Court applied the *Hearn* test and held that the insurer affirmatively injected the advice of its counsel into the case. *Id.* at 62, 13 P.3d at 1179. The court thus ordered the disclosure of communications between the insurer and its counsel. We believe that *Lee* goes too far, demonstrating that the *Hearn* test does not strike an appropriate balance of the need for discovery with the importance of maintaining the privilege.

[¶53.]     We supplement the *Hearn* test to emphasize further the importance of protecting the attorney-client privilege. First, the analysis of this issue should begin with a presumption in favor of preserving the privilege. Second, a client only waives the privilege by expressly or impliedly injecting his attorney's advice into the case. A denial of bad faith or an assertion of good faith alone is not an implied waiver of the privilege. *Clancy*, 936 N.E.2d at 277-78 (citing *Nat'l Union Fire Ins. Co. v. Dominguez*, 873 S.W.2d 373, 375 (Tex. 1994)). "Rather, the issue is whether Allstate, in attempting to demonstrate that it acted in good faith, actually injected its reliance upon such advice into the litigation." *Id.* at 278. The key factor is reliance of the client upon the advice of his attorney. *Id.* (citing *Harter v. Univ. of*

*Indianapolis*, 5 F. Supp. 2d 657, 664 (S.D. Ind. 1998)). Finally, a client only waives the privilege to the extent necessary to reveal the advice of counsel he placed at issue. *DM&E*, 2009 S.D. 69, ¶ 54, 771 N.W.2d at 638 (citing *Kaarup*, 436 N.W.2d at 21).

[¶54.] Because we remand for a new trial, we need not decide whether Allstate waived the attorney-client privilege by reliance on an advice-of-counsel defense. But depending on the pleadings, pre-trial proceedings, and the parties' presentation of the evidence on remand, Allstate may waive the privilege by expressly or impliedly injecting its counsel's advice into the case. It is for the trial court to make this determination based on the pleadings, pre-trial proceedings, and the parties' presentation of the evidence on remand.

[¶55.] **5. Whether the trial court abused its discretion by granting Allstate a protective order for its claims manuals, training materials, and salary administration materials.**

[¶56.] In early 2008, the Bertelsens requested production of Allstate's claims manuals, training materials, and salary administration materials. In September 2009, Allstate moved for a protective order regarding those materials. The Bertelsens filed a motion to compel. In January 2010, the trial court not only granted the Bertelsens' motion to compel, but it also granted Allstate's motion for a protective order. While the trial court required Allstate to produce the materials, it ordered that the materials be "used only in connection with, and in preparation for, the trial of this action." The trial court initially left open the question whether the materials would be admissible at trial but ultimately admitted some training materials into evidence.

[¶57.]     The Bertelsens argue that the trial court abused its discretion by granting Allstate a protective order for its claims manuals, training materials, and salary administration materials. SDCL 15-6-26(c) authorizes a court to grant a protective order upon a showing of good cause. Good cause is established on a showing that disclosure will work a clearly defined and serious injury. *Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973). The injury must be shown with specificity. *Id.* Broad allegations of harm will not suffice. *Id.* Because the grant or denial of a protective order is a matter within the trial court's discretion, we review the trial court's ruling on this discovery matter under the abuse of discretion standard. *Maynard v. Heeren*, 1997 S.D. 60, ¶ 5, 563 N.W.2d 830, 833 (citing *Weisbeck v. Hess*, 524 N.W.2d 363, 364 (S.D. 1994)).

[¶58.]     Allstate argues that its claims manuals, training materials, and salary administration materials contain confidential trade secrets. SDCL 15-6-26(c)(7) specifically contemplates the issuance of a protective order for a "trade secret and other confidential research, development, or commercial information[.]"[8] And

_____

8.     SDCL 15-6-26(c) provides in relevant part:

> Upon motion by a party or by the person from whom discovery is sought or has been taken, or other person who would be adversely affected, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending, on matters relating to a deposition, interrogatories, or other discovery, or alternatively, the court in the circuit where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(continued . . .)

SDCL 37-29-1(4), a provision of the Uniform Trade Secrets Act, defines "trade secret":

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (i)    Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (ii)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"The existence of a trade secret is a mixed question of law and fact." *Paint Brush Corp., Parts Brush Div. v. Neu*, 1999 S.D. 120, ¶ 14, 599 N.W.2d 384, 389 (quoting *Weins v. Sporleder*, 1997 S.D. 111, ¶ 16, 569 N.W.2d 16, 20). While the first prong of the test is a legal question, the second prong is a factual determination. *Id.* (citing *Weins*, 1997 S.D. 111, ¶ 16, 569 N.W.2d at 20).

[¶59.]    We thus consider whether the trial court abused its discretion by granting Allstate a protective order for its claims manuals, training materials, and salary administration materials on the ground that they contain trade secrets or other confidential information.[9]  Initially, the burden rests on the party opposing

---

(. . . continued)

> . . .
> (7)    That a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way[.]

9.    Several courts have concluded that insurers' claims manuals contain trade secrets and have therefore granted protective orders for them. *See, e.g., Hamilton v. State Farm Mut. Auto. Ins. Co.*, 204 F.R.D. 420 (S.D. Ind. 2001). But other courts have denied insurers' motions for protective orders of their claims manuals because they did not present sufficient evidence to establish that the manuals contained trade secrets. *See, e.g., A.P.L. Corp. v. Aetna Cas. & Sur. Co.*, 91 F.R.D. 10, 14-15 (D. Md. 1980); *McCallum v. Allstate*

(continued . . .)

discovery to show that the information is a trade secret or other confidential commercial information and that disclosure would be harmful to that party's interest in the information. *In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1032 (8th Cir. 1991). Once the party opposing discovery makes that showing, "the burden then shifts to the party seeking discovery to show that the information is relevant to the subject matter of the lawsuit and is necessary to prepare the case for trial." *Id.* (citation omitted). If the party seeking discovery shows both relevance and need, a court must weigh the injury that disclosure might cause against the need for the information. *Id.* (citation omitted). A court may issue a protective order to safeguard the rights of the parties if both satisfy their respective burdens of proof. *Id.*

[¶60.] Allstate presented evidence establishing that its claims manuals, training materials, and salary administration materials contain trade secrets or other confidential commercial information. At least two of the requested manuals contain the following statement:

> STATEMENT OF CONFIDENTIALITY
> This material has been compiled exclusively for internal use and is not for distribution outside of Allstate Insurance Company. It contains trade secrets and confidential information which are proprietary to Allstate Insurance Company. The use, reproduction, transmission, or disclosure of this material, in whole or part, without the express written permission . . .

---

(. . . continued)
    *Prop. & Cas. Ins. Co.*, 149 Wash. App. 412, 204 P.3d 944 (2009); *Woo v. Fireman's Fund Ins. Co.*, 137 Wash. App. 480, 486-92, 154 P.3d 236, 239-42 (2007). *See also Adams v. Allstate Ins. Co.*, 189 F.R.D. 331, 332-33 (E.D. Pa. 1999).

Additionally, Allstate presented evidence that it "does not voluntarily disseminate [these materials] outside of the company" and that it has "requested and successfully sought protective orders in other cases where claims manuals and training materials [were] requested." *See* SDCL 37-29-1(4). On these facts, the trial court did not err by concluding that Allstate's claims manuals, training materials, and salary administration materials contain trade secrets or other confidential commercial information.

[¶61.] But the Bertelsens were also able to satisfy their burden of proof. It was clear to the trial court that the materials were relevant to their bad faith claim or were at least "reasonably calculated to lead to the discovery of admissible evidence." *See* SDCL 15-6-26(b)(1). The trial court thus granted both the Bertelsens' motion to compel and Allstate's motion for a protective order. *See Remington Arms Co.*, 952 F.2d at 1032. It allowed the Bertelsens to access the materials while preserving the confidentiality of Allstate's commercially valuable information. Ultimately, we conclude that the trial court did not abuse its discretion by granting Allstate's motion for a protective order for its claims manuals, training materials, and salary administration materials.

## Conclusion

[¶62.] As we indicated in *Bertelsen*, Allstate breached its contractual and statutory duty to pay medical benefits for bodily injury immediately after AIG denied Bonnie's workers' compensation claim. 2009 S.D. 21, ¶ 22, 764 N.W.2d at 501. Furthermore, Bonnie's medical payments claim was not fairly debatable. *Id.* ¶ 20. The jury should have been so instructed on remand, and the failure to do so

prejudiced the Bertelsens' ability to fully and fairly present their case to the jury. We therefore remand for a new trial on the Bertelsens' punitive damages claim, on their breach of contract claim to determine contract damages, and on their bad faith claim to determine intent. We further direct the presiding judge of the Second Judicial Circuit to reassign this case to a different circuit judge within that circuit on remand. *See State v. Bult*, 1996 S.D. 20, 544 N.W.2d 214; *Sarver v. Dathe*, 479 N.W.2d 913 (S.D. 1992).

[¶63.] Affirmed in part, reversed in part, and remanded with directions for proceedings consistent with this opinion.

[¶64.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.